Argued March 10, affirmed April 20, 1960

CLARK *v.* PORTLAND TRUST BANK ET AL

351 P. 2d 51

*H. H. Phillips*, Portland, argued the cause for appellants. With him on the briefs were Phillips, Coughlin, Buell & Phillips; Clarence D. Phillips, Jarvis B.

Black; Seitz, Easley & Whipple and Norman L. Easley, Portland.

*Ferris F. Boothe*, Portland, argued the cause for respondent. With him on the brief were Black, Kendall & Tremaine, Portland.

Before McAllister, Chief Justice, and Warner, Sloan and Holman, Justices.

WARNER, J.

This is a suit for specific performance of an alleged oral contract to make a will with provisions for a monthly payment of $250 in favor of plaintiff, Helen Clark, a stepdaughter of Harrie E. McCraney, deceased. The defendant Portland Trust Bank is the executor of the decedent's will, dated November 17, 1954, and hereinafter referred to as the second will. The other defendants, except the Shriners Hospitals for Crippled Children, are legatees under the second will who were not named as beneficiaries under the first will, executed on the fourth day of February, 1953. From a decree in favor of plaintiff and impressing upon the property of the estate of McCraney a trust to enforce the same, the defendants appeal.

Plaintiff was about two years old when her mother married McCraney in 1910. No children were born to that marriage, nor as far as this record reveals, did McCraney have any children by any previous union. As a result, there was an exceptionally strong and affectionate father-daughter relationship subsisting between plaintiff and her father which continued uninterrupted except for occasional outbursts of Mr. McCraney's temper. Some such incidents will be hereinafter referred to, but all, so far as we are informed,

were eventually followed by amicable reconcilations and expressions of regret or apology on the part of Mr. McCraney. One of these occurred in 1929 when plaintiff married Mr. Clark, a man not approved by her father. The estrangement thus caused apparently continued until the birth of Mrs. Clark's first son, in February, 1932. Mr. and Mrs. Clark were divorced in 1949. From thence on plaintiff and decedent saw each other more frequently, increasingly so after her mother's death, in November, 1952.

In February or March, 1953, plaintiff had a conversation with Mr. McCraney in which he volunteered that he had made certain provisions in his will for the benefit of herself and two sons. This she testified to as follows:

"Q Now, subsequent to the death of your mother, do you recall discussing—or do you recall a conversation between yourself and your stepfather regarding his will or his plans for a will, and, if so, state what that was?

"A We never really had discussed anything of that kind, in the way of a definite will or anything; he just—one day we were talking in his living room and he did tell me—and I never saw the will, he said 'I want you to know that I have provided for the boys, I am leaving $5,000 for each of the boys which should help with their education. I don't have any family, I have absolutely no one in the world, and I will be leaving you—you can have my car, all my personal effects and there should be enough money to pay you in the neighborhood of $250 for your life.'

"Q Did he indicate that he had a will presently in effect with that provision?

"A He didn't actually show me a will, I think; I believe he said, 'I have made a will in those terms.'"

This is confirmed by a copy of decedent's first will. It provided for payments of $5,000 each to plaintiff's two sons, whom he regarded and treated as his grandsons. It also contained a further provision for an income of $250 per month for plaintiff as long as she remained unmarried.

While visiting the decedent in his home sometime in July, 1953, there was an occurrence which temporarily alienated plaintiff and her father. It seems that an innocent remark of hers addressed at that time to a feminine guest and friend of her father's was misunderstood both by him and the guest. It caused him to imagine that plaintiff was improperly concerned about his personal affairs and prompted him to advise plaintiff the next day to no longer call him father and to inform her that he was going to revoke the provisions made for her in the will of February 4, 1953. As reported and demonstrated by subsequent circumstances, Mr. McCraney was in error and his punishment of his daughter not justified.

Mr. McCraney carried out his threat to revoke the provisions made for Mrs. Clark in his first will. This elimination is reflected in the second will of November 17, 1954.

Plaintiff attempted unsuccessfully to conciliate the decedent and convince him that his attitude resulting from that incident was not warranted. Failing in her attempt to restore their erstwhile relationship, she left Portland on June 29, 1955, and moved to Sacramento, California, where she undertook steady employment with a local hospital, intending to remain there.

Sometime in April, 1956, her father went to Sacramento for the purpose of visiting plaintiff. Shortly after his arrival, he expressed his regret at his actions concerning the incident in his apartment in July, 1953.

At the same time he proposed that if she would agree to give up her employment and residence in Sacramento and return to Portland and live with him in his apartment for the rest of his life, he would in consideration change his will by reestablishing the testamentary provisions formerly made in her behalf.

The plaintiff, not immediately accepting his proposition, deliberated upon it for several days. Before she announced her final acceptance, her father again called her and added four conditions of which we will take notice. These were agreeable to her and on May 15, 1956, she terminated all of her Sacramento connections and the following day established herself in the home of her father, where she remained as his daughter and companion to and until his sudden death from a heart attack on October 8, 1956.

In the intervening five months between Mrs. Clark's return to Portland and his death, decedent failed to make the testamentary changes which the plaintiff claims he agreed to make.

The defendants present for our attention three assignments of error: first, the representation that there was an insufficiency of proof of a contract; second, that even if an agreement was proved, there was not adequate evidence of performance on the part of Mrs. Clark to take it out from under the statute of frauds; and, lastly, that Mrs. Clark had so breached the agreement that she was not entitled to specific performance.

Consequently, the appeal turns primarily on fact, posing two questions for our consideration: (1) was there an enforceable contract as alleged by plaintiff, and, if so, (2) did she breach it as claimed by defendants.

We first address ourselves to the question concerning the proof of the contract.

As is more usual than unusual when a testamentary agreement is made between two close members of a family, the only evidence regarding the offer and acceptance which ripened into the contract comes solely from the plaintiff. Because of its importance to the solution of the questions presented, we set out in substantial entirety Mrs. Clark's account of the conversation had by and between her and her father in Sacramento in April, 1956:

"A * * * And at 7:30 in the morning my 'phone rang, so when I answered it, I knew my father's voice; he had a distinctive voice, after all those years I recognized it. And he immediately said, 'Do you know who this is?' And I said, 'Of course I do.' So he told me that he had arrived in Sacramento the night before and tried to get me and I explained that I had been working * * *. So I told him * * * I had a car and could I pick him up and so he * * * told me he was staying at the Sacramento Hotel, and if I would come down there at 10:00 o'clock we could have breakfast and have a nice visit, which I did. We had breakfast, we visited up in his room * * *. Then we got in my car and I took him out to my apartment, which he was very pleased, thought it was very nice, thought he would like to have one just like it. We sat there and visited and it was during that time that he asked me if I had ever thought of coming back to Portland. I said, 'Not definitely, I was very happy,' explained— I spent quite a bit of time telling him about the job and how the boys [plaintiff's two sons] had been down and that Michael was due to arrive in a couple days. So that was it, we talked about my job, and finally he said, 'It seems a very silly thing, here you're all alone down here in Sacramento, I'm all alone in Portland and whatever that disagreement we had was over, I have even forgotten, I am sorry about it now, I don't even remember it, but I'd like to have you come back to Portland if you would consider it.' It took me by surprise, because

I had just felt that I was really established in Sacramento. So I said, 'I might think it over, it was kind of lonesome down there, but I had been lonesome up here too.' Then he said that he could not understand why I would like to live down there, he never liked Sacramento as I did, he couldn't understand that, and if I would give it some consideration, he said, 'If you'd come back to Portland you could live with me.' I realized that I couldn't do that because he had a one-room apartment, there would be no place for me. He said, 'Well, we can make arrangements for that.' So he also said that— he said, 'You're all alone down here.' He said, 'What security do you have?' And I said, 'Well, just as much as I'd have any place else.' Well, he said, 'Well, in the meantime, after all this trouble we had, you know, I left the bulk of my money to charity.' But he said it didn't have to be that way, he said, 'You know how I provided for you before, and if you want to come back to Portland and live with me, I'd be happy to make the same provisions for you that I had made originally.'

"Well, we didn't have much time to talk, and I said, 'Well, I'd have to think it over, there was an awful lot to consider. After all, I did have a good job and I was established and happy and rather enjoying my life and freedom down there. So he told me too that—well, let me explain. I had to be back to work, even though it was a Saturday, I couldn't have any weekends off, I had to be back to work at 3:00 o'clock that afternoon, so he said he guessed he wouldn't stay over, he would take the bus back to San Francisco where he had been staying in a hotel where his things were. He had taken a bus to Sacramento to see me, and he had had to stay overnight because he couldn't locate me Saturday night. So I took him back down and got his grip at the hotel and I drove him to the bus depot and he said, 'Now, you be sure to think it over and let me know,' and he said, 'give it lots of thought, but I think it would be a wonderful thing because after all you got your

boys there and I think it would be a wonderful thing for all of us to be together.' So I said I would give— think it over and give it some consideration and told him I'd let him know.

"Q  After Mr. McCraney left you, did you subsequently have a communication with him?

"A  Sometime after, I thought it over, well, my son Mike—that's the youngest boy—came to Sacramento and I think it was just either two or three days after father had left and he was very surprised that he had been down there and I explained to Mike at the time that father had been there and had wanted me to come back to Portland. I said, 'I don't know whether I want to go back or not; what do you think?' Mike thought, of course, it would be a fine idea, he said, 'I know you like your work down here, but it would be nice to have you back in Portland.' I said, 'Well, I am going to give it a lot of thought, but there are lots of reasons I don't want to go back, I don't know how it would work out, living with someone again, I have been alone for eight years and it's a little hard to adjust one's self to living with another person when you have been completely alone,' and I said, 'I think I'll weigh all the pros and cons and I may be back in Portland yet.' And I hadn't made up my mind at that time.

"Then father called me, possibly the following week, probably, I can't quote dates, it was somewhere in the neighborhood of two weeks—ten days to two weeks later he called me on the telephone and asked me if I had made up my mind and whether or not I would come up, and I said I had not made it up definitely because there were so many things to consider. Then he told me that I'd have to make up my mind right away, that he had a chance to take a two-room—a two-bedroom apartment at the Ione Plaza because there was a woman giving one up and would switch apartments, take this one-bedroom and let him have her two-bedroom, but that he had to let her know right away, and

I'd have to make up my mind first concerning it, because I knew I had to give some notice at the hospital, I knew I could give up the job although I hated to do it. I knew I had to give notice at my apartment and I didn't know about that, they sometimes hold you to thirty days after. Also I had the car on my hands, and he said he didn't want me to bring the car to Portland because it would be better to sell it in California. We had no use for two cars up here, he had his own which he didn't use very much and there would be no place for my car and he gave me the names of some people he knew in Sacramento, some old friends of his, whom he told me to contact and maybe they could help me sell the car, and to do what I could and let him know. I did call a couple of these people that didn't know anybody that wanted my car; I had a '51 Kaiser and I hated to take a big loss on it, but I found it very hard to sell a car just overnight or in a couple days, but I found a girl at the hospital who agreed to buy my car and that was my biggest thing. I didn't want to take a big loss, which I did; I gave it to her; I lost about $200 on it, but I sold her my car and my apartment manager agreed if I would let her show the apartment and she could rent it, she would let me go. I gave my notice at the hospital on the 1st day of May and I had to work through the 13th of May. Then I called him back and told him that everything was arranged. I had sold my car, I had given my notice. I explained that I had to work through the 13th of May at the hospital because they had nobody to replace me, but that I could be back in Portland—I would take the train the morning of the 15th, which I did, and I arrived here the night of the 15th of May of '56.

"Q Now, do you recall the—what, if any, conversation you had with Harrie McCraney on the second telephone call that you made to him?

"A Yes. Now, that's the first thing after it was all decided and I called to tell him when I

would be leaving and when I would arrive at Portland. Now, he said, 'I want you to understand there is some stipulations to which I expect you to adhere when you come up here. In the first place, I don't want you to see Mr. Holt.' That was the man—he is a man that I had seen that my father did not approve of, * * *. In the second place, he said I must get a job and he would expect me to pay the difference in rent of the one-bedroom and the two-bedroom apartment, which he judged to be—he said it would be about more than $40 a month; that was no problem. The third thing was that there would be no drinking and I specifically asked him, I said, 'I am not doing any drinking, except for beer, but I come home at night and if I am going to work up there, I will probably want the same thing, I come home at night and because of the hours there, I had a glass of beer before going to bed, so he said, 'Oh, well, that's all right.' I said, 'I don't think we're going to have any problems at all.' And he said, 'I am glad you're coming up.' And that was our conversation."

We pause here to note several principles of law governing our conclusions.

■ It is settled in this state that when a contract is wholly in parol, and the alleged promisor is dead, clear and satisfactory proof of the terms of the agreement and its strict performance by the promisee is required before specific performance of such contract will be granted. *Hawkins v. Doe* (1912), 60 Or 437, 441, 119 P 754; *Leadbetter v. Price* (1922), 103 Or 222, 228, 202 P 104; *Losey v. O'Hair* (1938), 160 Or 63, 73, 83 P2d 493; *Tiggelbeck v. Russell* (1949) 187 Or 554, 567, 213 P2d 156; *Hawkins v. Toombs* (1952), 194 Or 478, 483, 242 P2d 194.

■ An examination of the great number of cases which have heretofore been before this court involving specific performance of oral contracts to bequeath or

devise property of a decedent-promisor readily discloses that each case depends upon its own peculiar facts and circumstances. *Vandiver v. Stone* (1935), 149 Or 426, 429, 41 P2d 247; *Brennen v. Derby* (1928), 124 Or 574, 579, 265 P 425.

We have held that in a matter of this kind it is necessary to take into consideration the background of the relationship of the parties and the circumstances under which the contract was made. *Tiggelbeck v. Russell*, supra (187 Or at 574). We have called contracts of the instant kind "a natural agreement in the nature of a family settlement, and [which] should be carried out by the courts, if possible, because such arrangements are favored in equity." *Kelley v. Devin*, 65 Or 211, 218, 132 P 535.

■ The defendants argue that the agreement, as testified to by plaintiff, is wanting in the degree of clarity and certainty necessary to sustain the relief she seeks. We do not find it so.

Her recitals do not reveal contractual terminology of the kind that strangers might employ when dealing at arms length on matters to be reduced to writing. But here we have a father and daughter who had been close in terms of affection and mutual respect for most of Mrs. Clark's then 48 years. They had just repaired the wounds made by an old hurt which had separated them for the past three years. It was an occasion when resort is not made to language satisfying to a lawyer who places a premium on the selection of words expressing contractual engagements with meticulous nicety. Instead, Mr. McCraney and Mrs. Clark naturally resorted to phrases common to the family vernacular and so understood by them. Defendants attempt to depreciate its legal effect by referring to it as a "friendly conversation," words initially employed by Mrs. Clark

describing her conference with her father in Sacramento. We think her phrase was apt. It accords with the experience of normal conduct in families. Instead of subtracting anything from the legal significance of their negotiations, it gives to them the human element and usual character of conferences between close relatives who understand each other, have confidence in each others integrity and, therefore, feel they do not have to depend upon written instruments to reflect the terms of their every agreement.

We find it difficult to accept the defendants' argument that Mrs. Clark during the last five months of their life together should have taken steps to have urged her aggressive and opinionated father to change his will. Considering the state of his health, such a suggestion seems out of character for one of Mrs. Clark's temperament. That there were no after-discussions between them concerning Mr. McCraney's promise made in Sacramento finds satisfactory explanation in their respective personalities and their close relationship. We submit that in such a background adult children are not given to questioning parents about their earlier promises, nor are the parents given to repeated assurances of their ultimate fulfillment.

Speaking to the subject of the certainty of contracts to make wills, we find in 57 Am Jur 175, Wills § 197, the following statement:

"* * * Reasonable certainty, however, is sufficient, and if the meaning of the contract, taken as a whole, is intelligible to the court, specific performance will be decreed. The surrounding facts and circumstances properly in evidence may give point and effect to the real import of the contract so as to preclude an objection to specific performance asserting uncertainty in the contract. More-

over, the courts are not inclined to regard with favor objections on the ground of uncertainty of the agreement after the promisor has received the benefit of performance by the other party to the contract. And even though the agreement as originally made is open to the objection of uncertainty, it may be so supplemented by subsequent acts, agreements, or declarations of the parties as to have become enforceable."

See, also, Anno 106 ALR 749 re Agreement to Leave Property to Another:

"However, what is reasonable certainty in any case must depend upon the subject-matter of the contract, the purpose for which it was entered into, the situation in relation to the parties, and the circumstances under which it was made, and it may be stated that generally equity will only require reasonable certainty in the contract, and if the meaning, taken as a whole, is intelligible to the court, specific performance will be decreed."

Before closing our discussion of the defendants' first assignment of error, we call attention to three matters warranting special comment and as having weight in the formulation of our own conclusions. They relate to Mrs. Clark's attitude on the stand, Mr. McCraney's health and the interest he manifested in having his will changed.

We have often said, and repeat, that in a matter of this kind, the trial judge sits in position of greatest advantage. This attains more importance when the credibility or character of a witness is involved. One cannot read the carefully analytical opinion of the experienced judge in this case and avoid the complimentary impression which he gathered respecting Mrs. Clark. Our own reading of her testimony and his opinion, even without his superior advantage, incline

us to adopt one estimate made by her counsel; that is, she was a passive and self-effacing person. These qualities we find are emphasized by the candor and frankness which characterized her testimony throughout the trial and endow it with attributes of persuasiveness.

We do not know precisely when Mr. McCraney's health became a matter of concern to him. Mr. Seitz, his attorney and very good friend, testified that the decedent was suffering from and treating a condition of hypertension when they both were on a pleasure trip in Hawaii in January, 1955. The plaintiff knew her father's health was not good and that he had had heart trouble for sometime; likewise, the fact that "the man was fearful because of his health" and she knew "he didn't like to be alone at night" and added, "He liked somebody in the apartment." Whether this knowledge had been acquired before April, 1956, on the occasion of their California conference, or after is not exactly clear. There was apparent foundation for these morbid apprehensions, for he died of a heart attack on October 8, 1956. This occurred on the steps of St. Vincent's Hospital as he was entering to make a call on a friend who was a patient there.

Although Mrs. Clark made no representation that her father's health was a factor prompting him to go to Sacramento in the spring of 1956, we have no doubt it was an impelling circumstance on his part and was nonetheless a potent influence hastening her final acceptance of his proposition.

From the voices of all who testified we gather that Mrs. Clark's father was a man of integrity. He is also described by one of his intimate friends of many years as "close-mouthed" and not given to confiding "his family troubles or his financial situation." The testi-

mony of Mrs. Clark and others who knew him is substantially to the same effect. It is not surprising, therefore, that he had little to say about the agreement he had made with his daughter. Once he made reference to it by telling Mrs. Doran about the four conditions he had stipulated. It is evident the matter was very much in mind because we learn from Mr. Seitz, his attorney, that "sometime in the summer of 1956" Mr. McCraney said to him, "I'm thinking about making some changes in my will." More than once during the same summer he told Mrs. Doran that he had tried to see his attorney on several occasions for the purpose of changing his will. A fair inference is that delay in making a change was not a want of diligence on Mr. McCraney's part, but was apparently a matter of his attorney's convenience. As late as October 7, 1956, the day before he died, while visiting Mrs. Doran in the hospital, he again expressed his intention to change his will, saying: "I am going to try to see Maurice Seitz."

We hold that the instant contract is sufficiently precise in its terms that neither party could have reasonably misunderstood them, likewise sufficiently certain as to the testamentary obligations of the decedent, and supported by a valuable consideration.

■ Defendants' second assignment, as we have noticed, advances the proposition that the contract must fail because not in writing as required by the statute of frauds and if it is claimed that it is removed from the operation of that law by performance on the part of the plaintiff-promisee, then the acts upon which she relies are not referable to the agreement.

■■ In *Meads v. Stott* (1952), 193 Or 509, 537-8, 238 P2d 256, 239 P2d 594, we cited with approval the fol-

lowing sections from 49 Am Jur, which we deem particularly applicable here:

> "The courts have repeatedly asserted the principle that the statute of frauds is not to be applied in such way as to shield actual fraud or aid its perpetration, and a court of equity, so far as it can do so consistently with the intent and purpose of the statute, will in every proper way act to prevent a party to an oral contract from shielding himself under the statute when to permit him to assert the protection would enable him to commit a fraud on the other party to the contract, or enable him to enrich himself unjustly at the expense of the other. * * *" (49 Am Jur 885, Statute of Frauds § 579)

> "The acts of part performance, in order to be effective to remove an oral agreement from the operation of the statute of frauds, must be referable to and induced by the contract relied upon, and must have been done with a view to its complete performance. The acts proved in part performance must refer to, result from, or be committed in pursuance of the agreement proved. They must have been in consequence of the contract and such as would not have been done but for the contract, * * *." (49 Am Jur 734, Statute of Frauds § 428)

See, also, *Tiggelbeck v. Russell*, supra (187 Or 554); *Hunter v. Allen*, 174 Or 261, 278, 147 P2d 213, 148 P2d 936; *Losey v. O'Hair*, supra (160 Or at 73).

Even if the statute of frauds, upon which defendants rely, affected the case, the record here is replete with testimony of a part performance which is referable to and induced by the contract relied upon, thus taking the matter out of the statute. The contract is established and its performance on the part of Mrs. Clark is thoroughly proven and without substantial dispute.

We find that Mrs. Clark was happy in Sacramento when her father called upon her there. She had her

own apartment, her own car, and a position in a local hospital which was most satisfying to her. She had reached a point and place in her life where, as she expressed herself, she enjoyed her independence. Nearby were friends of earlier years. It was a community where as a small child she had lived and where she had gone to school for awhile. Behind her were the unhappy years which had preceded her divorce in 1949 and the incident which occurred in 1953, when her father, in what appears an unjustifiable outburst of temperament, disinherited her. Her contentment in her California home was attested by her father in conversation with friends after his return to Portland to whom he expressed himself as agreeably surprised and happy over her circumstances.

There was, in fact, nothing whatsoever to tempt her to forego the satisfying life she then enjoyed short of an agreement which offered a sound prospect for future economic security. She was then 48 years old and had only herself to look to insure her future well being in a material sense.

But it was only after several weeks' reflection that she was moved to accept her father's offer and whereby he became the beneficiary of her decision. To meet the terms of the agreement, she had to sell her car at a substantial loss (a sale made at her father's earnest suggestion), forego the friends and pleasant freedom she had created for herself in Sacramento, give up her satisfying position there with the hospital without certainty of obtaining a like or better one in Portland. These things she had to abandon in exchange for a way of life in Portland which she knew would be restrained in large part by the conditions imposed by her aging and ill father and a man of strong will and irascible temperament.

We find no merit in defendants' second assignment of error.

■ The last assignment of defendants advances the proposition that specific performance of the contract should be denied because, as they allege, plaintiff breached the conditions of the agreement.

It will be remembered these conditions were four in number. Her complete performance of three stands unchallenged. Defendants direct their attention to the fourth, relating to the subject of drinking, and rely on a single instance occurring in July, 1956, which offended Mr. McCraney. We decline to dignify the occasion by fuller statement, feeling as we do that defendants overemphasize its significance and that the degree of Mr. McCraney's expressions at the time were not merited by Mrs. Clark's conduct. Indeed, if conceded that his umbrage was justified, it is noteworthy that no one imputes to him any statement that he viewed it as a breach of their agreement or that he remotely suggested or threatened its rescission because of it. It is evident to us, and apparently to Mrs. Clark's father, that plaintiff's substantial performance of her part of the agreement remained unimpaired by her conduct of that one day, which at its worst could only be classified as neither wilful nor intentional, but only as inadvertent and without bad faith. Whatever disturbed the decedent at the time was condoned, for their arrangement continued thereafter without interruption to the day of his death.

■ If Mrs. Clark had, in fact, violated the contract and furnished her father ground for its rescission, it was his duty to exercise that right and give notice of the same. Failing to do so, so far as lack of performance or inadequacy of performance on her part was concerned, Mr. McCraney must be held to have waived

the matter. We so held in *Kelley v. Devin,* supra (65 Or at 218), a case where decedent's son sought specific performance of a parol agreement made with his father to leave an undivided half interest in all of the father's property to the son in consideration for services to be rendered and wherein the defendants, as here, charged the son with default because of his alleged inebriety. The court, in the Kelley case, speaking through Mr. Justice BURNETT, in reaching those conclusions also observed: "The answering defendants have no rights on their own behalf to rescind the contract for him [the deceased father], and it must stand and be executed." (65 Or at 218) See, also, *Woods v. Dunn,* 81 Or 457, 471, 159 P 1158.

The plaintiff has filed a motion requesting this court to supplement the decree appealed from by a provision insuring to plaintiff the payment of the monthly allowance of $250, accruing prior and subsequent to the entry of the decree from which the appeal was taken. The defendants have not resisted the motion. It appearing to us that a provision of that kind is just and equitable under the circumstances prevailing here and was inadvertently omitted and not discovered until the circuit court lost jurisdiction, we, therefore, direct that the decree be supplemented to provide that the monthly payments of $250 to Mrs. Clark shall be deemed to have accrued as of June 15, 1957, and shall be deemed to have continued to accrue thereafter until such time as the testamentary trustee shall receive the residuary portion of the estate of Harrie E. McCraney, deceased, and commence payments as provided in the decree.

The decree of the circuit court is affirmed without costs to either party.