Argued September 12, reversed and remanded with instructions
October 18, 1961

# BENNETT *v.* PRATT

365 P. 2d 622

*William H. Boland,* Portland, argued the cause for appellant. With him on the brief was B. G. Skulason, Portland.

*M. M. Orona,* Lebanon, argued the cause for respondent. On the brief were Morley, Thomas & Orona, Lebanon.

Before McAllister, Chief Justice, and Sloan, O'Connell, Goodwin and Brand, Justices.

BRAND, J.

This is a suit by the plaintiff lessee, Paul James Bennett, against the defendant-owner, Fern Pratt, for specific performance of an alleged oral five-year lease of farm property. After trial on the merits the circuit court dismissed the suit, awarded immediate possession of the farm to the defendant, and gave judgment against the plaintiff for $250 and costs. The plaintiff appeals.

The complaint alleges ownership by the defendant of the Pratt Farm (the description of which was stipulated) consisting of about 130 acres near Sandy, Oregon, and that on 7 June 1960

"plaintiff entered into an oral agreement with the defendant whereby the defendant agreed to rent said farm to the plaintiff for a period of five years beginning on the 7th day of June 1960, and the plaintiff agreed to lease the same from the defendant and to pay the defendant therefor rent at the rate of $250.00 per year."

It is further alleged that "Pursuant to said agreement and in reliance thereon, the plaintiff entered into the immediate possession of said farm and made permanent improvements * * *." The alleged acts of reliance consisted of the plowing of the value of $1,920; repairs to the sewer appurtenant to a house on the farm, the value of $8.00; the cutting and storing of hay in the barn thereon of a reasonable value of $100, and the purchase of roofing for necessary repairs of the value of $17. The plaintiff alleges that he is still in possession of the said real property and that it was agreed that the rent for the first year should be paid when the defendant executed and delivered to the plaintiff a lease in writing of the same tenor as said oral lease. The complaint then alleges that on 16 October 1960 the defendant notified the plaintiff that she repudiated said oral lease and that she refused to execute and deliver a lease in writing. She then demanded possession of said premises and refused payment of the first year's rent, which plaintiff offered to pay, and is ready, able and willing to pay. The prayer is for specific performance.

The answer contains a general denial except as

admitted. By way of separate answer and counter-claim, the defendant alleges that

> "the defendant entered into an oral agreement with the plaintiff renting the said Pratt Farm to him, but not including the said two dwelling houses, from said date until the crops had been harvested for the year 1960, or until about the 15th day of October, 1960, for the cash rent for that period in the sum of $250.00."

The reply is a general denial except that plaintiff admits defendant's ownership of the Pratt Farm.

At the outset we observe one feature which distinguishes this case from many others. Both parties expressly allege that there was a valid lease created by an oral agreement. The lessor contends that the term was from 7 July 1960 to 15 October 1960, and that the rental was $250 for that period, slightly in excess of four months, while the plaintiff contends that the lease was for five years at $250 a year. Under these circumstances the defendant can scarcely be heard to object to the lease because of the absence of detailed provisions concerning insurance, upkeep, maintenance of fences, use of fertilizers and other details not mentioned by either party to the oral agreement. In any event, whether we accept the contention of the plaintiff or of the defendant, the admitted lease did contain the three elements essential for any lease, i.e., the description of the property, the duration of the term, and the rental consideration. *Young v. Neill*, 190 Or 161, 166, 220 P2d 89, 225 P2d 66. Since the plaintiff contends that the lease was for a longer period than one year, the effect of the statute of frauds must be considered. ORS 41.580(5).

Our first question is whether the plaintiff's proof of the agreement for a five-year lease has met

the probative tests established in our decisions; for example, the proof must be "clear, unequivocal and by a preponderance of the evidence." *Le Vee v. Le Vee,* 93 Or 370, 377, 181 P 351, 183 P 773; or, "in the clearest manner." *Wagonblast v. Whitney,* 12 Or 83, 89, 6 P 339; or, "clear, certain and unambiguous." *Sprague v. Jessup,* 48 Or 211, 83 P 145, 84 P 802, 4 LRA (NS) 410; or, "full, complete and satisfactory * * * 'sufficient to satisfy a court of the truth of the allegations * * *.'" *Goff v. Kelsey,* 78 Or 337, 153 P 103; or, "clear, satisfactory and convincing." *Benson v. Williams,* 174 Or 404, 143 P2d 477, 149 P2d 549.

The latest decision is found in *Eugene Pioneer Cemetery Association v. Spencer Butte Lodge,* decided July 26, 1961. In that case the court said:

> "The specific performance of a parole contract for the conveyance of real estate will not be enforced under any circumstances unless the terms of the contract are shown by full, complete, and satisfactory proof to have been so precise that neither party could reasonably misunderstand them. * * *." Vol 72 Or Adv Sh 21, 1449, 1477, 363 P2d 1083, 1097. Citing cases.

The reason for the statement that the terms of the agreement must be "so precise that neither party could reasonably misunderstand them" was inserted because in that case there was an ambiguity as to the meaning of the words used, so that neither party could know what was intended. There is no implication that a conflict as to what the agreement was would bar specific performance, if the testimony on behalf of the plaintiff is full, complete and satisfactory as to its terms.

See *Young v. Neill,* supra.

We accept the rule substantially as stated in the cases cited, qualifying it only by giving approval also

to *West v. Washington Railway Co.,* 49 Or 436, 90 P 666. In that case the court repudiated the suggested rule that proof must be beyond a reasonable doubt and then considered, not only what was said by the plaintiff and the defendant as to the term of the lease, but also considered the circumstances surrounding the transaction which established a strong probability in favor of the accuracy of the plaintiff's testimony. Concerning the requirement of definiteness in any contract concerning which specific performance is sought, Corbin writes:

"Specific performance will not be decreed unless the terms of the contract are so definite and certain that the acts to be performed can be ascertained and that the court can determine whether or not the performance rendered is in accord with the contractual duty assumed. It is believed, however, that the required degree of definiteness and certainty is seldom much greater than is required for enforcement by other remedies. Courts should be ready to give those reasonable interpretations that ordinary business men are willing to give, seeking the aid of experts and giving heed to all the surrounding circumstances. There are cases in which the court has made a mountain out of a molehill and refused a decree that might well have been granted. Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact. * * *"

5 Corbin on Contracts, § 1174, p 756.

We now turn to the evidence.

The first conversation occurred at the home of a neighbor. At that time defendant, Fern Pratt, told the plaintiff that before leasing she wanted to check on his character in the neighborhood. They met later "around" June 7, 1960, at the Wilkenson place. Ac-

cording to plaintiff's testimony, defendant said she had checked on the plaintiff and "that she would give me the place, and she knowed I would have it for 5 years, and I made the agreement then." We quote further:

"Q And, now, just what was the agreement? What did she say and you say?
"A It was to be $250 a year, and it was to be a 5-year lease for it.

"Q 5-year lease?
"A Yes.

"Q Did she then say that you could have the farm for 5 years?
"A That's right.

"Q And was there any talk as to what you were going to raise on the farm?
"A Yes, sir; strawberries.

"Q Were there any strawberries growing on the place then?
"A No, sir.

"Q Now, do you know something about raising strawberries?
"A Yes, sir; worked for Ray Wilkenson for the last seven years.

"Q How long does it take to make a crop of strawberries?
"A Well, we was to work it this last summer and we would plant strawberries next spring, and, then, it would be a year.

"Q That is to say you would plant in '61?
"A Yes.

"Q And then there would be a crop in '62?
"A Yes.

"Q And would there be a crop again for the succeeding years?
"A Yes, for the next 2 or 3 years."

The evidence convincingly discloses that there were two houses on the Pratt Farm which were not included in the lease, but that the barn and the berry cabins were included. There were some filbert trees and some raspberries on defendant's place. The first rent was to be paid when the filberts were harvested, and a written lease executed in conformity with the oral agreement.

Plaintiff's brother, sister and father were present when the agreement was made. The brother, R. A. Bennett, supported plaintiff's testimony concerning the agreement. We quote:

"A Well, Mrs. Pratt came out to Ray Wilkenson's and me and my brother was standing out—no, she come over there, up on the porch of the cabin and she says, 'I have decided to lease you the place.' And she said, 'I suppose you want it for 5 years?' and my brother said, 'Yes.' and she said, 'You are going to grow strawberries so you will have to have it for 5 years,' and she says, 'all right, you can have the place.'"

The rent was $250 a year. Plaintiff's father testified that he also heard the agreement and his testimony also supports that of plaintiff. Both the brother and father testified that defendant told plaintiff to go to the farm and immediately start work. Plaintiff's father testified that the defendant said she had talked with Bob Louden, manager of the Hudson House Cannery, who buys strawberries, and that Louden said "he would back Paul [the plaintiff] on the plants, money to take care of the crop and so on, * * *." According to the witness, defendant said she expected Paul would want it for five years and that Paul answered, "Well, I'd have to have it for 5 years for the berries—for the strawberries, that's a 5-year plan

* * *." Defendant said, "I'm going to let you have the place, I want you to go to work as quick as you can on it, because it is in bad shape." Plaintiff then took possession. Plaintiff's sister, Patricia Fox, also testified to the same terms of the agreement in *full harmony* with the plaintiff's testimony. Plaintiff testified that there was to be a written lease "later" but the agreement was made "at the meeting on June 7."

Mrs. Pratt is the only defense witness who testified concerning the June 7th agreement made at Wilkenson's. She had investigated the reputation of plaintiff in advance. There was no testimony impeaching the credibility of any of the aforementioned witnesses. She testified that she had left the farm in 1953 and between 1953 and 1960 she had four different tenants on the land. She testified that at the first conversation with plaintiff he gave her a reference to Ray Wilkenson concerning his character, that she talked with Wilkenson and was satisfied with what he had to say. She also talked with Mr. Louden and discussed leasing the farm to the plaintiff. She then went to Wilkenson's. Plaintiff, his father, brother and sister "all of them were there." They "discussed" a five-year lease. Here her testimony diverges sharply from that of plaintiff's witness. She testified that they could have it for this "past year" (1960).

"A They was to farm it this past year.

"Q And then what?

"A And we would see about it. We would see about it in the fall. They was to see my brother.

"* * * * *

"Now, was anything said about how much you were going to rent this land for?

"A This past year $250, but not only—only this past year.

"Q Now, did you ever say anything more about what was to be done in future years?

"A No."

Defendant also differed as to time of payment of rent, claiming that $100 was to be paid in June and the balance of the $250 "At filbert time." She sought support for her position by calling her brother, Leslie Packard, as a witness. He testified:

"Q * * * after her husband's death and she moved away from there, what has been the management of that farm?

"A She has left that, more or less, up to me. All the decisions, and so forth, are mine."

There is no evidence that the defendant could not make agreements on her own behalf. He testified that sometime in June, but subsequent to the 7th, he had a discussion with plaintiff respecting the rental of the farm. Plaintiff, his father and brother were present. Packard testified that at that time it was agreed that plaintiff should rent the farm for one year at $250. It was to expire "this fall." How a lease for one year could expire in four-and-one-half months is not explained. He admitted there was discussion of a five-year lease but said no rental was agreed upon or any other details. He agreed that the proposed five-year lease was to raise strawberries. He notified plaintiff in October that there would be no lease. On cross-examination the witness testified as follows:

"Q You know nothing about the conversation between her and the Plaintiff, as they claim, on June 7th at the Wilkenson's place?

"A Not directly, just hearsay."

No strawberries had been raised on the farm for several years. We quote:

"Q What did you think he would raise on it in 4 and a half months?

"A Well, that wasn't even discussed. That was up to him.

"* * * * *

"Q What could he raise in 4 and a half months?

"A That was up to him.

"* * * * *

"Q Mr. Packard, I'm just asking. That is a fact, isn't it, it was very foul—very foul with weeds?

"A It has been."

In rebuttal, plaintiff testified that the discussion with the witness Packard was after defendant had "given me the okay to go to work" and after he had worked on the raspberries and had done some plowing. He denied any agreement for one year, and said Packard came because he wanted to see the equipment plaintiff had bought. Plaintiff showed him the tractor he was buying. Plaintiff told Packard that he had already made a deal with defendant, and defendant who was present did not deny it.

Russell Bennett testified Packard approved of the new equipment, "the new John Deere tractor and the rest." He and plaintiff's father, in rebuttal again, supported the plaintiff's testimony that there was no agreement for one year. Plaintiff's father, Amos Bennett, testified as follows:

"Q Did you hear any talk between Mr. Packard and Paul about a lease for the season of $250?

"A Well, it was the same agreement that she made over there when we was talking the first time,

and Paul told him then, he says, 'Well, we ought to have it in writing,' or something, and he said, 'Well, we'll fix it up in writing, too, because,' he said, 'you're doing a good job.'

"Q  Packard said that?

"A  Yes."

The testimony of R. J. Louden is of significance. His business was dealing with farmers concerning fruit. He buys strawberries and finances farmers. He had referred plaintiff to the defendant, in the first place, as a prospective renter. Defendant came to him and asked if he would back plaintiff if she leased the farm. He discussed the condition of the farm, added that "it costs a lot of money to clean up foul land, * * *." He told defendant that he understood that she had been getting $250 rent from the party that had it before and that it would be a fair rent to Bennetts "for this year and for next year," but after the land was put into production she would be entitled to more money. Louden testified that defendant returned later and

"she told me that she had decided to let Bennetts have the farm, being that I was going to back them, and I went down and bought them machinery myself, and I don't buy machinery for anybody unless they have a lease on the land.

"* * * * *

"A  She told me at the time when she left in the first place, and she understood then, and so do I, if I was to back them, it would have to be more than one year.

"Q  How long would it have to be?

"A  Well, with berries you have to have at least 4 years.

"* * * * *

"Q What Mrs. Pratt told you, Mr. Louden, as to the time she would rent this farm for?

"A For the length of time she would rent the Bennetts the farm would be the length of time for them to raise strawberries, absolutely."

So much for the evidence as to the actual conversation as to the term of the lease. We now consider the surrounding circumstances which lend credence to plaintiff's claim.

The evidence satisfies us that both parties contemplated that the plaintiff was to raise strawberries. For the raising of strawberries a period of four to five years is indispensable. It would require preparation of the soil in the fall of 1960, followed by planting in the spring of 1961. The first substantial crop would come in in 1962, followed by a crop for 1963. The crop "starts to go downhill the third year out in that country." The evidence is clear that no one in his right mind would lease land for the growing of strawberries for less than four or five years. The defendant had raised strawberries on this land before 1953 and certainly knew the facts concerning the raising of this crop. There was a mild suggestion that plaintiff could have planted potatoes in June and had a crop the first year, but the evidence persuasively shows that the soil was "foul"—"covered with weeds"—"awful poor condition"—"the ground was hard"—"hadn't been plowed in quite some time." Upon this point there was no conflict of testimony. There were 30 acres of land which would be suitable for raising crops. We quote from the defendant's testimony:

"Q Now, how could he farm? Could he farm in any other way than plowing and discing the 30 acres? Was there anything else for him to do?

"A No.

"Q No. Now, Mrs. Pratt, did you expect this young man to go ahead and clean up that 30 acres and get it ready for planting strawberries, and, then, get off the place last fall?

"A I didn't expect him to go to Hood River and—* * *."

Again, she testified:

"Q Oh. Well, now, what could he have raised in crops besides the filberts this year before the end of the harvest season?

"A He could have raised potatoes.

"Q Potatoes?

"A Yes.

"Q He could have plowed up the land and—

"A —raised potatoes or cabbage.

"Q He could have plowed that 30 acres and disced it and put in potatoes and raised a crop of potatoes last fall, is that it?"

Defendant admitted, however, that they never discussed raising potatoes and the rebuttal evidence was to the effect that the land was so badly dried out and full of weeds that the raising of potatoes before October 15 would be impossible.

Amos Bennett also testified that defendant told him that Louden had said "he would back Paul on the plants, money to take care of the crops and so on, * * *."

We find that the evidence clearly preponderates in favor of the existence of a five-year lease and that defendant, as a reasonable person, must have so understood.

As we shall show, the courts have differed somewhat as to the precise nature of the legal theory on the basis of which equity has assumed the power and

approved the propriety of awarding specific performance of oral agreements concerning interests in land. However, regardless of the specific theory expressed, the law is clear that equity will not grant specific performance unless there is part performance by a lessee in reliance on the oral agreement. Such part performance must be "related to * * * and be referable solely" to the contract. *Jenning v. Miller,* 48 Or 201, 204, 85 P 517. Again, the acts must be "pursuant to the terms of the oral lease and directly referable thereto." *Young v. Neill,* supra, 190 Or 161, 179, 220 P2d 89, 225 P2d 66. Our most recent decisions are in harmony as to this requirement.

In *Luckey et ux v. Deatsman,* 217 Or 628, 633, 343 P2d 723, the court speaks of the necessity of "conduct corroborating and unequivocally referable to the oral agreement."

In *Clark v. Portland Trust Bank et al,* 221 Or 339, 355, 351 P2d 51, we approved the rule that the acts of part performance "must be referable to and induced by the contract relied upon, and must have been done with a view to its complete performance."

A more liberal rule is approved in *Alery v. Alery, Jr., et ux,* 203 Or 101, 277 P2d 764, but we need not invoke it in this case.

We next inquire what the plaintiff did corroborating and unequivocally referable to the oral agreement and in reliance thereon. He entered into possession immediately with the express permission and at the request of the defendant. He bought a John Deere tractor, plow and disc for the purpose of carrying out the agreement, being financed on the machinery by Louden, who expected to buy the strawberries. He disced the filbert orchard, as requested by defendant and cultivated some raspberry bushes on the place.

He got $630 gross out of the five or six acres of filberts, from which should be deducted the value of the work of cultivating that land, and the cost of picking. There is no evidence as to either cost, but it must have been substantial. He cut about five tons of hay and stored it in the barn. He cleaned the sewer lines—"had to dig it out and open it up." He bought five rolls of roofing paper for repairs on the pickers' cabins, but never put it on or paid the rent because before the filberts were completely harvested, defendant's brother came out on 16 October and "said that he had sold the place and that he wanted me to move off and I told him that due to the work on the place I—and the 5-year lease—that I could not move off and, so, I did not."

Plaintiff testified that defendant told him "to go ahead and plow and farm the ground for strawberries, which will be put in next spring." Prior to 16 October when plaintiff was ordered off the premises, he had used the tractor 480 hours in cultivation of the farm, according to the motor meter on the tractor, of which they informed defendant at that time. The evidence is in dispute as to the amount plowed and disced prior to 16 October. Witness McCoy, who purportedly bought the place from defendant, testified that approximately 30 acres had been plowed. He estimated that half the plowing and discing was done after 16 October. Plaintiff testified that the plowing of the 30 acres was in preparation for strawberries and was exclusive of the work on the berries and filberts. But as to the number of hours in which the tractor operated prior to that date, there is no conflict. Plaintiff disced most of the land seven times in preparation for strawberry planting. The usual cost for tractor discing is $6 an hour, or a total of $2,880 for the work done.

R. A. Bennett testified that defendant and her brother came out to the place one day prior to 16 October and "they said the ground looked awful good, and her brother said he'd back us 100 per cent." We conclude that the plaintiff in good faith acted as above stated in reliance upon the oral agreement and that his conduct was unequivocally referable to the oral agreement. The evidence also demonstrates that the defendant knew that plaintiff was claiming a five-year lease and was doing work which was referable solely to and was in reliance upon that lease.

The case of *Dunis v. Director et al,* 121 Or 500, 255 P 474, applied the broad rule in favor of specific performance based upon valuable improvements when coupled with proof of acquiescence by the lessor. That case also suggests that such improvements so made operate, not only to remove the bar of the statute, but are also of probative value on the issue of the existence of the contract. 121 Or 500, 506. To the same effect, see *Friberg v. Bjelland,* 95 Or 320, 186 P 1113.

The final contention of defendant is that even if the contract for five years is proven and plaintiff's conduct was unequivocally referable thereto, equity will not specifically enforce such contract unless it is fair and reasonable. She contends that the contract on which plaintiff relies was unreasonable and that therefore a court of equity in its sound discretion should withhold relief. In support, defendant cites *Wagner v. Savage, as Adm'r,* 195 Or 128, 149, 244 P2d 161; *Tiggelbeck v. Russell et al,* 187 Or 554, 567, 213 P2d 156; and *Benson v. Williams,* 174 Or 404, 434, 143 P2d 477.

Defendant contends that the rental of $250 a year for five years is unreasonable in view of the fact that the taxes alone were $489 a year, and at an unspecified

time in the past the place had rented for $1,000 a year. Our first comment is that such an agreement is at least more reasonable than the agreement for which defendant contends, namely, that plaintiff would lease for four-and-one-half months, buy machinery, spend labor in plowing and discing the land of the value of $2,800, in preparation for strawberries which could not even be planted within the term of the lease. Yet, we are compelled to choose between these alternatives which are alone presented by the pleadings. But we also have evidence that the farm had been previously rented for $250 a year. Witness Louden testified that $250 a year would be reasonable for the two years, 1960 and 1961, but after that defendant should have more money and that after 1961, $1,000 would be a reasonable rental. Concerning the condition of the farm, Mr. Louden testified:

"A Well, I would say that—and also what Mrs. Pratt would say it was in—it was in the worse condition of any farm in the country. Not any fault of Mrs. Pratt's. I mean, she hasn't had the renters on there that have taken any interest in her land in the past few years at all, and you might say, actually, it was a jungle growing on the Pratt's farm."

The witness testified further:

"we were anticipating spraying the place with Amino Triazole or Dowpon, which is a weed killer, to put the land in better condition, because in raising strawberries your biggest cost of raising strawberries today is keeping the weeds out of it. * * *"

Louden testified that he backed the Bennetts on the machinery himself. As to the amount of taxes, it must be remembered that there were two houses on the farm, one large and one small, which were not

included in the plaintiff's lease, but were undoubtedly considered in the valuation for taxation. The defendant rented one or both of the houses during plaintiff's occupancy, but there is no evidence of the amount of rent paid. Nor is there any evidence as to whether the two houses were a part of the leasehold when defendant was getting $1,000 a year rent. The evidence does show that defendant had been trying to sell the farm, but, as Louden tesitfied:

"A  *  *  *  everyone has known that Fern has planned to sell that place for a year, but the condition it was in at the time she couldn't get anyone to stop and look at it.

"Q  The place was for sale for sometime?
"A  I think its been for sale for years."

Considered out of context, we would agree that after the land had been adequately cleared of weeds, cultivated and planted to strawberries, and after they had come into bearing, $250 a year would not be an adequate rental. But that is not the question here. Our question is whether the rental of $250 a year for five years was reasonable in view of the fact that the first two years would be operated at great loss and the increased rental value could not be produced without the large expenditures made during the fall of 1960 and which would be made in 1961. The performance of $2,880 worth of plowing and discing in partial preparation for future planting, and the other labor and expenditure on which future production depended was compensated only by a paltry return from filberts and a few raspberries. Further large expenditure would have become necessary in 1961, especially in view of the admitted bad condition of the farm. These facts and the further fact that defendant had previously rented the place for $250 calls for the conclusion that

averaging early loss with probable gain in 1962-3, a yearly rental of $250 was reasonable. The fact that defendant agreed to it with full knowledge of the conditions would indicate that she considered the rental reasonable. Her motive was obviously to get her property back into production for the future through the labor of plaintiff.

■ There has been some diversity in the Oregon decisions as to the legal theory on the basis of which a court of equity will grant specific performance of an oral contract concerning lease or sale of land. Many early cases put the decision on the ground that where a plaintiff incurred expenses, changed circumstances or made improvements to such an extent that a refusal on the part of the defendant to perform a parol agreement would operate as a fraud on the plaintiff, such an agreement will be specifically enforced. "The statute of frauds was never designed to shield against the perpetration of a fraud." *Meads v. Stott,* 193 Or 509, 238 P2d 256, 239 P2d 594; and *Young v. Neill; Friberg v. Bjelland,* and *West v. Washington Railway Co.,* all supra, and *Wallace v. Scoggins,* 17 Or 476, 21 P 558. Other cases find justification for withholding specific performance on the basis of estoppel. *Cooper v. Thomason,* 30 Or 161, 45 P 295.

In *Hayward v. Morrison et ux,* 194 Or 335, 348, 241 P2d 888, the court said:

"The foundation of this doctrine is fraud; not necessarily an antecedent or positive fraud, but a fraud inhering in the consequence of this setting up the statute. It applies where to permit the defense would be inequitable and unconscionable." Citing cases.

But the court also held that defendant in that case would be barred by the doctrine of equitable estoppel

because of her knowledge of, and acquiescence in, plaintiff's acts in reliance.

Other cases base the rule on the duty to prevent unjust enrichment. In the recent case of *Luckey et ux v. Deatsman,* supra, 217 Or 628, 633, the court has somewhat broadened the base upon which these cases are decided. The court said:

"* * * Although we have said in some of our cases that the doctrine of part performance rests upon the theory of equitable estoppel, it would be more accurate to state the doctrine more broadly and recognize that the terms of an oral agreement will be enforced (1) if there is conduct corroborating and unequivocally referable to the oral agreement sufficient to satisfy the policy of the statute designed to minimize perjured claims and the opportunities for fraud, and (2) if there are equitable grounds for enforcing the contract whether those grounds are found in facts establishing the basis for a true estoppel or in facts justifying the avoidance of unjust enrichment or relief from fraud."

In this connection, see Note, 75 ALR 650.

Whether judged by the classical view or by the more recent authorities, we conclude that the oral contract for a five-year lease was proven and the acts by plaintiff were definitely referable to the contract. We hold that to invoke the bar of the statute of frauds would constitute a fraud on plaintiff; that the defendant's conduct was such as to estop her from invoking the statute of frauds which would result in her unjust enrichment. We find that all requirements for specific performance specified in *Luckey v. Deatsman,* supra, are met and the contract itself was reasonable in the light of all the circumstances.

The decree of the trial court is reversed.

It appears that the defendant has filed a "restitution bond" and we assume has taken possession of the property from the plaintiff.

It will be the decree of this court that plaintiff is entitled to the specific performance of the contract upon which he relies, and the case is remanded to the circuit court for further proceedings pursuant to this decree and for the determination of the rights of the parties under the bond and existing circumstances.