Argued April 9, affirmed July 15, 1965

# PAULSON ET AL *v.* PAULSON ET AL

404 P. 2d 199

*Ferris F. Boothe,* Portland, argued the cause for appellants. With him on the briefs were Black, Kendall, Tremaine, Boothe & Higgins, Portland.

*Warde H. Erwin,* Portland, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and O'Connell, Goodwin and Denecke, Justices.

DENECKE, J.

Plaintiffs, son, daughter, and certain grandchildren of John Paulson, deceased, seek specific performance of an alleged oral contract made by John Paulson to make a will devising them all of his property. The issue is whether such a contract was made. The trial court held for defendants.

Defendant Mary Paulson is the widow of the decedent and the stepmother of the decedent's children. The bank defendant is trustee and executor and the other defendant is a contingent beneficiary under the will and trust agreement of John Paulson.

Decedent was married many years to Christina Paulson. He bought and sold timber land; frequently title to lands purchased was placed in Christina's name. At least one reason for this was that John Paulson expected he would predecease his wife and he believed this procedure would be advantageous if that contingency occurred. Christina died in 1938 when John was 63 and still active in timber speculation. About 10 days after her death he submitted instruments to his children and their spouses for execution. These released to John Paulson whatever interest the children derived from their mother.

John married Mary in 1941. The timber previously purchased greatly appreciated in value and various

parcels were sold in the 1950's for hundreds of thousands of dollars. Substantial gifts were made to the living children; a small trust was created for decedent's daughter's children, plaintiffs in this suit. There was considerable testimony that the children were suspicious that Mary had designs on the property of their father. The evidence indicates that, whatever the cause, John, in his last few years, believed his children were after his money.

In August 1960 John created two trusts: one for Mary, and one providing for payments, after his death, of $150 per month for each of his two children, and upon their death, the corpus to their issue. At this same time he executed a will devising his assets to these trusts. During 1960 and 1961 moneys were drawn from bank accounts of John and joint accounts of John and Mary and placed in the trusts, in other accounts, or used for the purchase of bearer bonds. In January 1961 John's mental condition was deteriorating and he was in and out of hospitals and nursing homes. He died in November 1961.

The federal estate tax return states that approximately $285,000 was transferred to Mary during John's life and about $140,000 to the two trusts.

The most critical evidence is that of what transpired when the children executed the conveyances to their father. The testimony of all the witnesses is approximately the same. The testimony of the one disinterested witness, Mrs. Rosella Smith, is as follows:

"He said he had papers made out. It would be better for all of them, because everything he had now would go to the children. The children would get everything he had at his time of passing away. * * *

"* * * I know he said everything they had

they had saved for the children and when they were gone he wanted his children to have it. * * *"

The conveyances of the real property recited:

"* * * it being known by the parties of the first part that it was intended between said Christina Paulson and the said J. E. Paulson, at the time of the conveying of said property that the title of the foregoing real property was conveyed to them as husband and wife, and that in the event of the death of either of them, that the title should vest in the survivor and the conveyance is to effectuate said intention to vest in J. E. Paulson the fee simple title thereto."

The release of the personal property recites:

"* * * it being known to us that the personal property of said Christina Paulson was the personal property of the said J. E. Paulson and that said J. E. Paulson had transferred the title of said personal property including moneys, to said Christina Paulson for the purpose of facilitating and transacting business and that it was the intention of Christina Paulson to have transferred the said personal property to said J. E. Paulson, prior to her death, and that this instrument is intended to effectuate said intention, and vest the title to said personal property in said J. E. Paulson, free from any claims of the heirs at law of said Christina Paulson, other than the said J. E. Paulson."

An oral contract to make a will must be proved by clear, concise, and convincing evidence.[1] *Barchus v. Pioneer Trust Co.,* 229 Or 268, 270, 366 P2d 890 (1961). In *Cook v. Michael,* 214 Or 513, 527, 330 P2d 1026 (1958), we stated: "[P]roof by 'clear and convincing evidence' means that the truth of the facts asserted is highly probable," not merely "more proba-

[1] See Note, *Oral Contracts to Make Wills in Oregon,* 42 Or L Rev 133 (1963), for a complete resume.

bly true than false." As the evidence in this case is not basically in dispute, it is the inferences to be drawn from this evidence which must be proved by clear and convincing evidence.

■■ This is in equity; therefore, we have the duty to hear the matter de novo. We find that the decedent, John Paulson, did not contract to devise his property to his children. We interpret the father's words as a statement of a belief that in the future he would devise his property to his children. We do not interpret his words to mean that if the children assigned whatever interest their mother had to their father, he would promise to execute a will, leaving the children all his property.

We believe our interpretation of John Paulson's intention is a natural one. His wife of many years had just died. He was 63. His three children, ages 32, 30 and 21, where his only objects of affection and bounty. His character and relationship with his children were such that he was not likely to bargain with them, rather, he considered himself as the patriarch, as did they, and benefactions during his lifetime or at his death would come as gestures of affection and fulfillment of a patriarch's obligation, rather than as a matter of contractual obligation.

*Barchus v. Pioneer Trust Co.,* supra, is partially in point. There, the decedent made statements that she was going to will her farm to her nephew. We held: "We conclude that these occasional statements credited to the decedent were at most mere expressions of an intention to do something in the future." (229 Or at 273)

*Hawkins v. Toombs,* 194 Or 478, 487, 242 P2d 194 (1952), is also illustrative. Plaintiff relied upon a

letter to plaintiff in which the decedent wrote, "then if something should happen to Ma or me, this property be yours anyway." This was held not to be evidence of any agreement to devise.

We have held that it is not necessary in order to establish an oral contract to will that language be used "satisfying to a lawyer who places a premium on the selection of words expressing contractual engagements with meticulous nicety." *Clark v. Portland Trust Bank,* 221 Or 339, 350, 351 P2d 51 (1960). However, in the *Clark* case the evidence indicated a quid pro quo transaction. The plaintiff stepdaughter testified that her deceased stepfather had said to her:

> " 'Well, in the meantime, after all this trouble we had, you know, I left the bulk of my money to charity.' But he said it didn't have to be that way, he said, 'You know how I provided for you before, and if you want to come back to Portland and live with me, I'd be happy to make the same provisions for you that I had made originally.' " (221 Or at 346)

(Originally, the stepdaughter and her two sons had been well provided for in his will.)

The recitals in the conveyances and releases are also evidence that John Paulson did not intend to contract to will his property to his children in return for their execution of these documents. The children probably had a substantial interest in the lands held in the name of their mother, particularly the California lands; so if the decedent had intended to make a contract, there was adequate consideration. However, the recitals in the instruments prepared for John Paulson are evidence of his belief that his wife had no real interest; therefore, the children were not releasing any substantial interest and had nothing to offer,

except expediting the clearing of title and funds, in exchange for any promise by their father.

■ We are buttressed in our conclusion by the decision of the trial judge that there was no contract. We have often stated in equity cases that when "the inferences and innuendoes to be drawn from the testimony are several, great reliance is to be placed upon the findings of the trial judge." *Clauder v. Morser,* 204 Or 378, 391, 282 P2d 352 (1955); *Cline v. Larson,* 234 Or 384, 418, 383 P2d 74 (1963). In this case the trial court in its memorandum opinion stated:

> "* * * The testimony did tend to disclose to the Court, the feelings and prejudices of the witnesses; an observation of which I believe is most important in determining the truth in this matter. The Court mentions the feelings and opinions of the witnesses because of the importance of basing its decision in this case on the facts and not on what the Court or any other person might think was the proper manner in which John E. Paulson should have disposed of his property. * * *"

This is the kind of case in which the opinion of the person seeing the witnesses, listening to the testimony, and sensing what can never completely be reproduced in the transcript, should be given great weight.

Affirmed.