894 P.2d 402

**Joy Ortiz NASHAN, Petitioner,**

**v.**

**Charles L. NASHAN, Jr., Respondent–Appellant,**

**v.**

**Willie V. ORTIZ, individually, and Willie V. Ortiz, Trustee of the Willie V. and Edith June Ortiz Revocable Trust, Defendants–Appellees.**

**No. 15687.**

Court of Appeals of New Mexico.

Feb. 24, 1995.

Certiorari Denied April 5, 1995.

Paul D. Gerber, Gerber, Ahern & Aikin, P.A., Santa Fe, for respondent-appellant.

Gregory D. Huffaker, Jr., Bradley C. Barron, Huffaker & Barnes, P.C., Santa Fe, for defendants-appellees.

## OPINION

FLORES, Judge.

This case concerns an alleged breach of an oral agreement to exchange services for real property and an ownership interest in a business. The case originally began as a divorce proceeding between Joy Ortiz Nashan (Joy) and Charles Nashan, Jr. (Nashan). Nashan brought Joy's father, Willie Ortiz (Ortiz), into the case because Ortiz refused to acknowledge that the marital community owned a house and a one-half ownership interest in the family business, and refused to transfer to the community legal title to the house and shares of stock in the business. Nashan alleged that the house and ownership interest were given to the marital community in exchange for his agreement to move to Santa Fe and work in the family business, and asked for a declaratory judgment establishing the marital community's rights to the house and a portion of the business. In effect, Nashan's pleadings requested specific performance of the alleged oral agreement. Since that agreement was oral, Ortiz moved for summary judgment on the ground that enforcement of the agreement was barred under the statute of frauds. Ortiz also maintained that the statute of limitations had run on Nashan's cause of action for breach of contract. The district court granted Ortiz's motion for summary judgment without specifying the basis for its decision. Nashan appeals from that judgment, and we reverse.

### STANDARD OF REVIEW

Since this is a summary judgment case, Nashan argues that we must view the facts in the light most favorable to him, and that we must make all reasonable inferences from the evidence in his favor. *See Knapp v. Fraternal Order of Eagles,* 106 N.M. 11, 12–13, 738 P.2d 129, 130–31 (Ct.App.1987). Ortiz acknowledges that this is the appropriate standard for most summary judgment cases. In this case, however, since the statute of frauds is involved, he maintains that a different standard applies. According to Ortiz, in cases involving an oral agreement and, as here, an alleged part performance of that agreement that takes the case out of the statute of frauds, the performance must be "unequivocally referable" to the alleged agreement. Since that is the case, Ortiz argues, even in reviewing the summary judgment this Court may determine whether any inference could be drawn from the evidence that would contradict the claim that an oral agreement existed. In other words, we need not draw all inferences from the evidence in favor of Nashan, but should only determine whether inferences contrary to Nashan could be made from the evidence.

As we discuss below, we agree that the "unequivocally referable" test is one means courts have used to decide whether an oral agreement existed and should be enforced. The existence of this test, however, does not change the standard of review for summary judgment in cases such as this one. *See Hubbard v. Mathis,* 72 N.M. 270, 383 P.2d 240 (1963) (in reviewing summary judgment granted to a defendant where the plaintiff claimed an oral agreement to exchange services for an interest in real estate, Supreme Court stated that the pleadings, depositions, affidavits, and admissions must be viewed in the most favorable aspect they will bear in support of the party opposing the motion). Thus, we must view the facts presented below in the light most favorable to Nashan and, drawing all inferences in his favor, determine whether he has raised a genuine issue of material fact regarding both the statute of frauds issue and the statute of limitations issue. If so, summary judgment should have been denied. *See Knapp,* 106 N.M. at 13, 738 P.2d at 131.

### FACTS

According to Nashan, the formation of the oral contract and the terms of that contract were as follows. In 1973, Nashan and Joy were living in Chicago, and Nashan was working for his father, earning $14,000 per year. Ortiz asked Nashan to return to Santa Fe, where Nashan had gone to college and had met Joy, to become general manager of two new businesses that Ortiz and his wife (June) were just starting. As compensation for moving from Chicago, leaving his current employment, and working in the newly started family business, Nashan and, through him, the marital community, would receive a house in Santa Fe, would become equal partners in the new family business, and would

have their moving expenses paid for the move from Chicago to Santa Fe. He was originally offered $14,000 per year as salary, but after he arrived in Santa Fe he agreed to accept $10,000 per year as his beginning salary.

In attempting to prove that the alleged oral agreement existed and should be enforced, Nashan introduced evidence by way of depositions, affidavits, and exhibits. We recite that evidence in the light most favorable to Nashan's position. At the time Nashan was approached by Ortiz with the idea of moving the Nashan family to Santa Fe, Nashan had been offered a different job in Chicago paying $16,000 to $18,000 per year. Nashan turned down the offer and agreed to accept Ortiz's offer, taking a lower salary in reliance on the other portions of the compensation package offered by Ortiz. Upon moving to Santa Fe in 1973, Nashan became general manager of the family businesses, the primary focus of which was the operation of La Tertulia Restaurant in Santa Fe (the Ortizes had also started a corporation called Mercado Hispano Del Norte, Inc.—the two businesses were subsequently merged into the same corporation). At the time Nashan arrived to take the general manager position, the businesses were not doing well financially. For twenty years, Nashan regularly worked sixty-five hours per week in the restaurant and the other businesses, often putting in as much as eighty hours or more per week. Joy admitted in her deposition that the effort and time her husband put into the operation of the businesses was consistent with ownership, or the assumption of ownership, of the businesses. Throughout the twenty years that he worked as general manager, Nashan was paid a salary that was below market rates for such a position. In fact, he was approached several times about accepting similar positions in the food industry at substantially higher salaries, but rebuffed these approaches by saying he did not want to leave his position as part owner of the family-run business. In addition to his below-market salary, Nashan did receive other compensation that was in the nature of the benefits one derives from owning a business. He and Joy participated equally with Ortiz and June in dividing all the profits derived from the business. The two families took equal cash distributions from the business on a weekly basis during the year, and at the end of the year both families received equal cash bonuses. Both families had cars provided by the business, and the business paid for expenses such as accounting and tax preparation expenses and entertainment expenses for both families. Due at least in part to Nashan's time and efforts, the family business became quite successful and profitable for both families.

Throughout the twenty-year period in which Nashan was general manager of the business, the Ortizes made frequent representations to other people and to the Nashans to the effect that the Nashans were co-owners of the family business. In 1975, when La Tertulia was merged into the corporation and became a corporate possession, the Ortizes issued a notice and policy statement to La Tertulia's employees identifying the owners of the restaurant as Willie and June Ortiz and their children, Chuck and Joy Nashan. Later, as late as 1990, Nashan and Joy were identified as shareholders of the corporation in minutes of the corporation's annual meeting. June provided information to a national publication, *Who's Who in America's Restaurants*, identifying both the Ortizes and the Nashans as owners of La Tertulia. In discussions with employees, customers, and other people, the Ortizes consistently identified the Nashans as co-owners of the family business.

In addition to receiving benefits similar to those received by the Ortizes, and to being identified as co-owners of the business, the Nashans incurred risks and shared hardships with the Ortizes. When Nashan first assumed his position with the business, and the restaurant had not yet begun doing well financially, Nashan agreed to delay depositing his paycheck until there was enough money in the bank to cover it, to ensure that the employees' paychecks would be honored. Nashan, on several occasions, provided personal guarantees for credit that had been extended to the business, to ensure that the business could obtain the credit it needed in order to operate. Nashan and Joy (who also worked for the business, as a hostess at the

restaurant) were not covered by workers' compensation insurance because, in filings with the Workers' Compensation Administration, they were identified as employees who owned at least ten percent or more of the outstanding stock of the business. Finally, the Nashans from time to time provided places to live for employees of the business, at reduced rent or no rent. They were not compensated for this by the business.

Regarding the portion of the agreement involving the house, the facts most favorable to Nashan include the following. The Ortizes initially gave the Nashans earnest money with which to purchase a house, but that sale fell through. A year or two after the Nashans moved, the Ortizes remodeled and provided a house to the Nashans that was located in the family compound in Santa Fe. Over the years, the Nashans have spent approximately $200,000 in remodeling the house and building an addition to it. They have also expended considerable personal effort and time in improving the house. The Ortizes have never asked for rent or for any monetary compensation for the use of the house.

According to the evidence submitted by Nashan, the Ortizes consistently acted as if the Nashans owned the house and were co-owners of the business. The first indication to the contrary occurred after Joy filed for divorce from Nashan. At that time, Ortiz repudiated the agreement by refusing to transfer legal title to the house and shares of stock in the business and threatening to have Nashan removed from the restaurant premises by force.

*APPLICABLE LAW—STATUTE OF FRAUDS*

Nashan makes two main arguments concerning the statute of frauds. He maintains that no statute of frauds applies to the oral agreement because it is an employment agreement for an indefinite term. He also contends that the agreement should be enforced in spite of the statute of frauds, because he performed his part of the agreement and that performance was sufficient to remove the agreement from the statute of frauds. We hold that Nashan has raised genuine issues of material fact as to whether

such an oral agreement as he describes actually existed, and as to whether it would be inequitable to deny enforcement of that agreement. Therefore, we need not address his contention that no statute of frauds applied to the agreement. We do note, however, that courts have consistently applied the statute of frauds doctrine to agreements, such as this one, requiring the exchange of services for present or future interests in real property. *See Hubbard,* 72 N.M. at 273, 383 P.2d at 242; *In re McGee's Estate,* 46 N.M. 256, 127 P.2d 239 (1942).

■ In determining whether Nashan has made a sufficient factual showing to survive summary judgment on the statute of frauds issue, we must analyze what he was required to prove. Since he contends an oral agreement was made, he must of course prove that such an agreement actually existed. In addition, to avoid application of the statute of frauds and obtain specific performance of the alleged agreement, he must prove that he has performed his part of the agreement to such extent that it would be inequitable to deny enforcement of the agreement. *See Alvarez v. Alvarez,* 72 N.M. 336, 341, 383 P.2d 581, 584 (1963) (where an oral contract not enforceable under the statute of frauds has been performed to such an extent as to make it inequitable to deny effect to the contract, equity may consider the contract as removed from the statute of frauds); *Montoya v. New Mexico Human Servs. Dep't,* 108 N.M. 263, 266, 771 P.2d 196, 199 (Ct.App. 1989) (oral contract may be given effect when it has been performed to such extent that it would be inequitable to deny enforcement); *see generally* 2 Arthur L. Corbin, *Corbin on Contracts* §§ 425–442 (1950 & 1994 Pocket Part).

■ It is not a light matter to refuse to apply the clear rule of the statute of frauds, that oral contracts for the conveyance of property are not enforceable. For that reason, courts have demanded that a litigant wishing to establish that performance has removed the agreement from the statute of frauds prove the existence of the agreement by clear, convincing, and cogent evidence. *Alvarez,* 72 N.M. at 341, 383 P.2d at 584;

*Paulos v. Janetakos,* 41 N.M. 534, 540, 72 P.2d 1, 4 (1937). In addition, courts have formulated a number of tests or factors that are applied to the plaintiff's evidence, to assist in deciding both whether an agreement existed and whether equity requires that the agreement be enforced.

Corbin has summarized the factors applied by the courts as follows: (1) the performance alleged by plaintiff must be in pursuance of the contract and in reasonable reliance thereon, without notice of any repudiation of the contract by defendant; (2) the performance must be such that the remedy of monetary restitution is not reasonably adequate, making it very unjust for the defendant to hide behind the statute of frauds; and (3) the performance must be one that is in some degree evidential of the contract and not readily explainable on any other ground. Corbin, *supra,* § 425.

■ New Mexico case law is in accord with the general discussion contained in Corbin, although the language used in the opinions varies somewhat from that used by Professor Corbin. In *Alvarez,* our Supreme Court, citing *Burns v. McCormick,* 135 N.E. 273 (N.Y.1922) and *Woolley v. Stewart,* 118 N.E. 847, 848 (N.Y.1918), stated that in part-performance cases, there must be performance that is "unequivocally referable" to the agreement, meaning that the performance is such that it is unintelligible or at least extraordinary unless as an incident of ownership. *Alvarez,* 72 N.M. at 342, 383 P.2d at 585. We believe that the "unequivocally referable" test is another way of stating Corbin's third requirement, that the performance be evidential of the existence of a contract and not readily explainable on some other ground. *See Candelaria v. Sandoval,* 84 N.M. 387, 389, 503 P.2d 1165, 1167 (1972). This requirement is imposed because the evidence of part performance is designed to show, among other things, that there must have been a contract or plaintiff would not have performed the acts that make up the part performance. *Id.* The "unequivocally referable" concept has been analyzed as requiring actions of part performance that are significant of ownership of the property, rather than some other agreement or rela-

tionship. *Burns,* 135 N.E. at 273. The Alabama Supreme Court has explained the test in plain language as meaning that an outsider, knowing all of the circumstances of a case except for the claimed oral agreement, would naturally and reasonably conclude that a contract existed regarding the land, of the same general nature as that alleged by the claimant. *Smith v. Smith,* 466 So.2d 922, 925 (Ala.1985).

■ Another test applied in prior New Mexico cases is the principle that equity will regard the bar of the statute of frauds as removed if plaintiff's performance is such that it would amount to fraud upon the plaintiff to use the statute as a defense. *Hubbard,* 72 N.M. at 273, 383 P.2d at 242; *Paulos,* 41 N.M. at 540, 72 P.2d at 4–5. This is simply another way of stating Corbin's requirement that it would be highly unjust to refuse enforcement of the contract.

In cases such as this one, involving the alleged exchange of services for real property or ownership interests in real property, some prior decisions have indicated that the services performed must be extraordinary or exceptional, so that they are incapable of being compensated by a measurable monetary standard. *Hubbard,* 72 N.M. at 273, 383 P.2d at 242; *Paulos,* 41 N.M. at 540, 72 P.2d at 4. An alternative showing, that the plaintiff's whole course of life was changed by performance of the contract, may be made. *In re McGee's Estate,* 46 N.M. at 259, 127 P.2d at 240; Annotation, *Remedies for Breach of Decedent's Agreement to Devise, Bequeath, or Leave Property as Compensation for Services,* 69 A.L.R. 14, at 133 (1930). Corbin appears to regard the "change in course of life" factor as simply one way of showing that the performance is not of the type that is capable of being compensated with money. Corbin, *supra,* § 436. Both factors, in any event, appear to fit into the second and third tests mentioned by Corbin, that the remedy of restitution must be inadequate and that the performance must be evidential of the existence of a contract.

One quite specific factor that has been discussed by many courts is the issue of improvements to the property. Where the plaintiff has taken possession of the property

and has made valuable, permanent, and substantial improvements, specific performance of an agreement to convey the property will often be granted. *See, e.g., Shipp v. Thomas*, 58 N.M. 190, 193, 269 P.2d 741, 742–43 (1954); Corbin, *supra*, § 434.

Some of the foregoing factors are relevant to the question of the existence of the agreement. Others are relevant mainly to the fairness issue. Some appear to be relevant to both inquiries. Whatever the purpose of each test, however, the main questions are the same for a court faced with a case such as this one—was there actually an oral agreement such as that alleged by the plaintiff, and if so would it be inequitable to deny enforcement to the agreement? The factors should not be applied mechanically to determine whether the plaintiff's performance has met a particular test. Instead, the case must be viewed as a whole to determine whether specific performance of the agreement is required. *See* Corbin, *supra*, § 425.

## APPLICATION OF THE LAW TO THE FACTS OF THIS CASE

The question in this case is whether, viewing the facts in the light most favorable to Nashan, he has raised a genuine issue of material fact concerning the existence of the agreement and the equities of enforcing or refusing to enforce the agreement. In response to Nashan's brief in chief, Ortiz has relied heavily on the "unequivocally referable" factor and has dissected Nashan's proof, positing an alternative explanation for each item of evidence presented. For example, Nashan pointed out the memorandum to La Tertulia employees presenting the Nashans as owners of the restaurant, along with the Ortizes. Ortiz theorizes that this representation of ownership might have been made to give Nashan more authority over the restaurant's employees, some of whom had been with the restaurant longer than Nashan. We do not believe this is a proper approach. Instead, in reviewing the summary judgment, the circumstances must be viewed as a whole, in the light most favorable to Nashan, to determine whether he has met the burden imposed by the factors previously discussed.

Doing so, the evidence favorable to Nashan may be summarized as follows.

Nashan was working at his parents' business and living in Chicago, earning $14,000 per year and with an offer of a different job at higher pay. In response to Ortiz's alleged offer, Nashan left his job, left Chicago, moved to Santa Fe, and took a $4,000 cut in pay. He worked long and hard at the family business for twenty years, at below-market salary rates, turning down overtures from other potential employers who were offering much higher salaries. The Nashans shared the benefits of ownership equally with the Ortizes, and also participated in the risks, such as granting personal guarantees for indebtedness and foregoing coverage under the workers' compensation statute. The Ortizes and Nashans consistently identified themselves as co-owners of the restaurant. With regard to the house, the Nashans remained in the same house for almost twenty years and spent a substantial sum of money remodeling and building an addition, instead of purchasing a different residence.

Nashan has raised genuine issues of material fact concerning the tests or factors that his evidence must meet. For example, by moving from Chicago, giving up a possible career there with his parents' business, turning down one job offer before he moved, and refusing several overtures concerning different employment after he joined the family business in Santa Fe, Nashan might convince a fact finder that he has established that the whole course of his life has been changed by performance of the contract. Under these circumstances, monetary restitution may not be an accurate measure of compensating Nashan for his actions, making specific performance appropriate. *Cf. In re McGee's Estate*, 46 N.M. at 259, 127 P.2d at 240.

As to the existence of the contract itself, taking possession of the house and making substantial, extensive improvements to it, instead of spending the money on a different residence, is evidence of an agreement that the house belonged to the Nashans. *Bennett v. Pratt*, 228 Or. 474, 365 P.2d 622, 629–30 (1961); *Shipp*, 58 N.M. at 193, 269 P.2d at 742–43; Corbin, *supra*, § 434. In addition, Nashan's evidence of the parties' conduct

over the course of twenty years also raises an issue of fact as to whether an agreement existed—the Ortizes acted as if the Nashans were co-owners of the business, and the Nashans did so as well.

■ Concerning Ortiz's argument that Nashan's performance is not "unequivocally referable" to the alleged contract, we note that the performance need not positively exclude every other possible explanation. Instead, the performance must be such that it indicates an agreement existed, and the performance must not be readily explained in the absence of such an agreement. *Candelaria*, 84 N.M. at 389, 503 P.2d at 1167.

We focus first on Nashan's part performance with respect to the house. Taking possession of property and making substantial, valuable improvements to it is "one of the most satisfactory evidences of part performance." *Townsend v. Vanderwerker*, 160 U.S. 171, 184, 16 S.Ct. 258, 262, 40 L.Ed. 383 (1895); *see also, e.g., Bear Island Water Ass'n v. Brown*, 125 Idaho 717, 874 P.2d 528, 533 (1994) (the most important acts constituting sufficient part performance are actual possession, permanent and valuable improvements, and these two combined); *Ryan v. Earl*, 618 P.2d 54, 57 (Utah 1980) (possession is an important fact, and when combined with permanent and valuable improvements, will almost always lead to specific performance); *Hayt v. Hunt*, 10 Colo. 278, 15 P. 410, 412 (1887) (most important acts constituting sufficient part performance are actual possession and making permanent, valuable improvements). The Nashans' expenditure of $200,000 and substantial amounts of time and effort for permanent improvements to the house raises an issue of fact about whether those acts were performed in reliance on an agreement conveying the house to them. *See Easley v. Easley*, 333 S.W.2d 80 (Mo. 1960) (grandson's expenditure of time, labor, and money on improvements to house were sufficiently referable to an alleged oral agreement by grandfather to convey house to grandson in exchange for services; court opined that it was not reasonable that grandson would do the work and expend the money on a house merely on the hope that he

would be allowed to live in it for some indefinite period of time).

We now consider Nashan's performance with respect to the business. The mere facts that Nashan worked many hours for many years, and declined to pursue other job opportunities, may not be "unequivocally referable" to the contract. *See Martin v. Scholl*, 678 P.2d 274, 278–79 (Utah 1983) (ranch foreman's long hours not atypical of such an employee's life, and declining other offers is not sufficient part performance). This makes sense under the *Burns* and *Smith* formulations of the test, because working long hours and staying with the same employer instead of leaving are not necessarily actions that signify ownership of a business, or actions that only an owner would take. Loyal employees who are devoted to their work and their employer often do the same.

There is evidence in the record, however, of other behavior by the Nashans that raised an issue of fact about whether such actions would be highly unusual for a non-owner employee. These actions include the following: (1) delaying cashing their own paychecks to ensure that the employees' paychecks would be covered during the time the business was struggling; (2) foregoing workers' compensation coverage, thereby saving the business money but rendering themselves self-insurers; (3) extending personal guarantees for credit lines from suppliers of the business; (4) providing free or low-cost housing for employees of the business, without any compensation from the business; (5) accepting less-than-market salaries for their positions, and instead taking the risk (along with the Ortizes) that the business would not do well financially; (6) having the company provide accounting and tax preparation services, as well as entertainment expenses. There is at least a genuine issue of fact as to whether an outsider viewing these facts would reasonably believe that these were the actions of an owner, not merely an employee. It is at least plausible, for example, that even an upper-level manager would expect some sort of compensation for providing housing for company employees, would not agree to delay cashing his own paycheck, and would hesitate to personally guarantee debts of the

business. Therefore, we hold that the evidence was sufficient to overcome summary judgment on the question of whether Nashan's performance concerning the business was "unequivocally referable" to an agreement that he and his wife would have an ownership interest in the business.

In so concluding, we recognize Ortiz's argument that an alleged oral contract between family members must be scrutinized even more closely than a contract between unrelated parties. There is some question as to whether such a heightened scrutiny should be applied in a case such as this one, involving extensive arm's-length negotiations between a son-in-law, who is a college graduate, and a father-in-law. *See Alvarez*, 72 N.M. at 342, 383 P.2d at 585 (finding no necessity to apply heightened scrutiny where similar factors existed). We do believe, however, that a close family relationship between the parties is an important factor to consider, along with other circumstances, in deciding whether a party's performance is "unequivocally referable" to a contract to convey real property. *See, e.g., Smith*, 466 So.2d at 926 (considering the history of the land and the parties' relationship as twin brothers, one brother's possession of the property could be viewed as referable to their relationship rather than the alleged agreement). For example, where the performance consists of the provision of services such as caring for an aging parent, other evidence might be necessary to demonstrate that the performance was referable to an agreement rather than to the love and devotion of the child. In this case, however, there is at least a fact question as to whether the Nashans would have invested such substantial amounts of time and money in the house merely because of the familial relationship between the parties.

We hold that Nashan has raised a genuine issue of material fact concerning the existence of the agreement. Also, due to the evidence of Nashans' long period of possession of the house and the substantial and valuable improvements made to it, Nashan's actions in connection with the business that could be viewed as more like those of an owner than an employee, the substantial changes in the couple's life and Nashan's

forbearance from pursuing other opportunities, and the alleged fact that nothing indicating repudiation of the agreement occurred until after Joy filed for divorce, Nashan has raised a genuine issue of material fact as to whether equity requires that the alleged oral agreement be enforced. For that reason, if the district court granted summary judgment on the statute of frauds ground, that decision is reversed.

## STATUTE OF LIMITATIONS

The statute of limitations on a breach of contract claim runs from the date the contract is breached. *Smith v. Galio*, 95 N.M. 4, 6, 617 P.2d 1325, 1327 (Ct.App.1980). Ortiz argues that the statute of limitations on Nashan's claim began to run long ago, at approximately the same time the contract was formed. In support of that argument, he contends that the alleged agreement was breached when Nashan arrived in Santa Fe and Ortiz failed to turn over title to the house or any shares in the corporation.

This contention misconstrues the nature of the parties' alleged agreement. Viewing the facts in the light most favorable to Nashan, what the parties contracted for was that the Nashans would receive a house and become part owners of the family business. According to the evidence introduced by Nashan, there was no breach until after Joy filed for divorce, when Ortiz repudiated the Nashans' ownership of the house and business. Until that time, the Ortizes acted as if the Nashans owned both the house and part of the business—they allowed the Nashans to move into the house, make renovations, and build an addition; they consistently acknowledged the Nashans as part owners of the business to customers, employees, the general public, and state agencies; they allowed the Nashans to participate equally in the division of cash profits of the business; and the only time the issue of legal title ever came up, they reassured the Nashans by saying "Why do you want it now? It's all—it belongs to both of you anyway."

For purposes of the statute of limitations, Nashan's cause of action for breach of the agreement regarding the house did not accrue until Ortiz challenged Nashan's own-

ership interest. "[W]here one person has paid a full purchase price and otherwise performed all the conditions in an agreement for the purchase of land ..., and the vendee has fully performed and has entered into possession of the land, the statute [of limitations] does not run while the vendee is in possession with the acquiescence of the vendor." *Frank v. Tavares*, 142 Cal.App.2d 683, 298 P.2d 887, 890 (1956) (suit on oral agreement for sale of land). *See Wooley v. Shell Petroleum Corp.*, 39 N.M. 256, 268, 45 P.2d 927, 934 (1935); *cf. Garcia v. Garcia*, 111 N.M. 581, 588, 808 P.2d 31, 38 (1991).

Likewise, for purposes of the statute of limitations, Nashan had no cause of action against Ortiz with respect to his alleged share of the ownership of the business as long as Nashan was treated as a co-owner and Ortiz did not repudiate Nashan's claimed interest or refuse to respond to a demand by Nashan for a proper stock certificate. At least as between the seller and purchaser of stock, "[i]ssuance of a stock certificate is not a prerequisite to the formation of a shareholder relationship." *Wilkinson v. Reitnauer*, 421 Pa.Super. 345, 617 A.2d 1326, 1330 (1992). *See* 12A William M. Fletcher, *Fletcher Cyclopedia of Corporations* § 5613, at 349 (rev. ed. 1993) ("The ... title passes, if such is the intention of the parties, even though the stock may remain in the name or in the possession of the seller."); *Copeland v. Swiss Cleaners*, 255 Ala. 519, 52 So.2d 223, 228 (1951). Given the evidence adduced by Nashan, we cannot say that his claim to an interest in the business is barred by the statute of limitations.

Ortiz also argues that no date was set for the performance of the contract, so the action for breach of contract accrued on the date the contract was formed. However, the cases cited by Ortiz in support of his proposition are cases involving money debts based on oral agreements. *See, e.g., Akre v. Washburn*, 92 N.M. 487, 489, 590 P.2d 635, 637 (1979).

*CONCLUSION*

Throughout this opinion, we have viewed the evidence in the light most favorable to Nashan, and have drawn all inferences from that evidence in his favor. Our factual asser-

tions should not be interpreted as binding the district court upon remand for further proceedings. Applying our standard of review, we hold that Nashan has raised genuine issues of material fact that prevent summary judgment on both the statute of frauds ground and the statute of limitations ground. For that reason, we reverse and remand to the district court.

**IT IS SO ORDERED.**

HARTZ and PICKARD, JJ., concur.