This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-37759**

**THE ESTATE OF RICHARD P. COOK,**

Plaintiff/Counterdefendant-Appellee,

v.

**REX P. WILSON,**

Defendant/Counterclaimant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Valerie A. Huling, District Judge**

Jackson Loman Stanford & Downey, P.C.
Travis G. Jackson
Meghan D. Stanford
Leah Stevens-Block
Albuquerque, NM

for Appellee

Hunt & Davis, P.C.
Catherine F. Davis
Blake A. Whitcomb
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**YOHALEM, Judge**

{1}      Plaintiff Richard P. Cook[1] sued his former business partner, Defendant Rex P. Wilson, alleging breach of a personal guaranty. Wilson counterclaimed alleging, among other things, breach of the operating agreements which govern the parties' jointly

---

[1]Cook died during the proceedings in the district court and was replaced as a party by The Estate of Richard Cook (Cook).

owned businesses. Both parties moved for summary judgment claiming that the opposing party's claim was time-barred by New Mexico's six-year statute of limitations for actions on written contracts. *See* NMSA 1978, § 37-1-3(A) (2015). The district court granted both motions for summary judgment, dismissing Cook's claim and Wilson's counterclaim as time-barred. Wilson appealed and Cook cross-appealed. We affirm the district court's grant of summary judgment on Cook's breach of guaranty claim and reverse and remand for trial on Wilson's counterclaim for breach of the Cook/Wilson Entities' operating agreements.

**Standard of Review**

**{2}** "An appeal from an order granting a motion for summary judgment presents a question of law subject to de novo review." *Farmington Police Officers Ass'n Commc'n Workers of Am. Local 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 13, 139 N.M. 750, 137 P.3d 1204. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Bank of N.Y. Mellon v. Lopes*, 2014-NMCA-097, ¶ 6, 336 P.3d 443. "In reviewing an order on summary judgment, we examine the whole record on review, considering the facts in a light most favorable to the nonmoving party and drawing all reasonable inferences in support of a trial on the merits." *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035, ¶ 9, 335 P.3d 1243. "[W]here there are disputed questions of material fact as to whether a [party's claims are] barred by the statute of limitations, these questions are to be decided by a jury." *Medina v. Fuller*, 1999-NMCA-011, ¶ 22, 126 N.M. 460, 971 P.2d 851.

**BACKGROUND**

**{3}** Cook and Wilson were partners for eleven years in a highly profitable real-estate development business: "the Cook/Wilson Entities." The business began in 1998 with a single company. Limited Liability Companies (LLCs) were added as the business expanded. With one exception,[2] each LLC had only two members: Cook and Wilson. According to the operating agreements governing the LLCs,[3] Cook and Wilson were to share profits and losses equally.

**{4}** Beginning in 2004 and continuing until 2006, a series of distributions of profits were made to Cook in amounts larger than distributions to Wilson. Wilson alleged that the parties approved the unequal distributions with the understanding that profits and losses would be rebalanced before the Cook/Wilson Entities wrapped up.

---

2Cook and Wilson each owned a one-third interest in an entity known as Vista Arroyo, LLC.
3Cook questions Wilson's reliance on a single operating agreement to establish the terms of all the operating agreements for the Cook/Wilson Entities. Cook, however, did not dispute Wilson's claim that the operating agreements are identical and did not introduce evidence refuting that claim. Rule 1-056(D)(2) NMRA. We, therefore, assume for purposes of this summary judgment decision that the provisions of the operating agreements at issue are identical.

**{5}** It was undisputed that Cook and Wilson discussed the need to rebalance several times beginning as early as 2006, with an eye toward agreeing on a dollar figure. Sometime in 2007, Wilson asked the Cook/Wilson Entities' bookkeeper to review the books and analyze the amounts required to rebalance profits and losses. The bookkeeper prepared a spreadsheet dated November 16, 2007, which lists the results of her review and concludes that Cook owes Wilson $1,664,190.25 to equalize the distribution of profits from the Cook/Wilson Entities.

**{6}** On February 3, 2008, Cook wrote to the Cook/Wilson Entities' tax accountant, "requesting that the accounting and tax returns for the [remaining four LLCs] not be finalized" until Cook approves them. Cook explained that the delay was needed because "Rex Wilson and I are in the process of settling remaining issues concerning the Cook/Wilson entities."

**{7}** The November 16, 2007, spreadsheet became the basis of a March 5, 2008, meeting between Cook, Wilson, and the Cook/Wilson Entities' tax accountant to attempt to reach agreement on the amount required to rebalance. At the meeting, Cook and Wilson disagreed about the items to be included in the rebalancing, the amounts, and even which party owed money to the other.

**{8}** On April 30, 2008, Daniel Balise, the tax accountant for the Cook/Wilson Entities, wrote a letter to Cook "in follow up to our meeting with you and Rex [Wilson] on March 5, 2008, in which we discussed financial matters relating to the Cook/Wilson [Entities]." The letter refers to the November 16, 2007, spreadsheet "showing the amount that would be payable by you to [Wilson] to balance your interests in the ventures, thereby allowing a termination of your dealings with each other." It states that a revised spreadsheet is attached, "taking into account agreed to items and certain concessions by [Wilson]." After reviewing the items in the spreadsheet, the letter conveys an offer from Wilson. Wilson proposes that Cook pay $1,387,388.55 "to balance your interests in the Cook/Wilson [Entities]."

**{9}** The spreadsheet includes a credit in the amount of $771,014 in a column headed "Wilson owes Cook to balance." The $771,014 figure is the amount of a 2006 guaranty from Wilson to Cook that was part of the purchase price of R & R Roadrunner Parking, Inc. (R & R Parking), an airport parking business which was one of the first jointly owned Cook/Wilson businesses. In 2006, R & R Parking was sold by the Cook/Wilson Entities to a Wilson-owned LLC. Wilson executed a personal guaranty on a $771,014 promissory note which matured in 2007. Wilson's alleged breach in 2007 of that personal guaranty is the subject of both Cook's complaint against Wilson and Cook's cross-appeal. Cook claims on cross-appeal that the April 30, 2008, letter and attached spreadsheet are an admission by Wilson of the debt on the guaranty sufficient to revive the statute of limitations, pursuant to NMSA 1978, Section 37-1-16 (1957), on Cook's otherwise time-barred contract claim. The facts relevant to Cook's claim on the guaranty will be explored in greater detail in the discussion of Cook's cross-appeal below.

**{10}** Cook did not accept the April 30, 2008, offer. Discussions of the need to rebalance and the amounts required of each party to rebalance continued after April 30, 2008. Sometime later in 2008, Cook brought in an outside accountant and eventually both Cook and Wilson hired lawyers. The Cook/Wilson Entities' final tax return was filed on December 27, 2009, without rebalancing.

**{11}** Cook filed his action for breach of Wilson's personal guaranty on December 27, 2013. On March 4, 2014, Wilson filed his answer and his counterclaim for breach of the Cook/Wilson Entities' operating agreements.

## DISCUSSION

**I.     Wilson's Appeal: Disputed Facts Preclude Summary Judgment on Wilson's Counterclaim for Breach of the Operating Agreements**

**{12}** Cook moved for summary judgment, alleging that Wilson's counterclaim for breach of the operating agreements was time-barred. Cook argued that Wilson's cause of action accrued when the unequal distributions were made, between 2004 and 2006, or, at the latest, on November 16, 2007, when Wilson had knowledge of sufficient facts to constitute a cause of action. According to Cook, Wilson's counterclaim was filed at least three months after the expiration of the six-year statute of limitations for actions on a written contract, Section 37-1-3(A).

**{13}** In response, Wilson contended that the operating agreements governing the Cook/Wilson Entities permitted unequal distributions to the members at the members' option, requiring only that the overall profit be divided equally prior to the final wrap-up of the Cook/Wilson Entities. Under Wilson's construction of the operating agreements, there was no breach of the operating agreements until the Cook/Wilson Entities wrapped up in 2009 without having rebalanced, or at the earliest, in late 2008, when Cook arguably repudiated the agreement to rebalance. Wilson claimed that his counterclaim was therefore timely filed within six years after the contract was breached.

**{14}** The district court granted Cook's motion for summary judgment, concluding that Wilson's counterclaim was time-barred because Wilson knew on November 16, 2007, that the operating agreements had been breached by the unequal distribution of profits, and Wilson's counterclaim was filed more than six years after that date.

**{15}** In his appeal, Wilson argues that the district court misconstrued the operating agreements, incorrectly concluding that the operating agreements unambiguously required that each distribution made to Cook and Wilson as the sole members of the Cook/Wilson Entities be divided equally. Under the district court's construction, the agreements were breached each time an unequal distribution was made from 2004 to 2006, or, at the latest, when Wilson discovered the amount owed by Cook on November 16, 2007.

**{16}** Wilson contends that the operating agreements allowed for a different construction of the terms governing the distribution of profits: profits were to be equalized by the time the Wilson-Cook Entities wrapped up their business. According to Wilson, the operating agreements did not require equal annual distributions. Under Wilson's construction of the operating agreements, there was no breach of contract until Cook failed to rebalance profits and losses in late 2008 or 2009, and, therefore, Wilson's counterclaim was timely filed on March 4, 2014.

**{17}** Wilson seeks reversal of summary judgment on the ground that the agreements' terms concerning the division of profits are unclear. He claims a reasonable fact-finder could adopt either party's construction of the operating agreements. He seeks remand to allow a jury to determine the intent of the operating agreements and the date of breach. We agree that the terms of the operating agreements governing distribution of profits are ambiguous and that remand for trial is required.

**Standard of Review**

**{18}** "Whether contractual terms are ambiguous is a question of law, subject to de novo review." *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 9, 299 P.3d 844. A contract term is ambiguous if it is reasonably susceptible to more than one construction. *See Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 845 P.2d 1232.

**{19}** In determining whether a contract provision is ambiguous, courts are not limited to the face of the contract. *C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶¶ 14-15, 112 N.M. 504, 817 P.2d 238. In making the threshold determination regarding ambiguity, courts may consider "evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." *Id.* ¶ 15. "If the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact-finder." *ConocoPhillips Co.*, 2013-NMSC-009, ¶ 10 (alteration, internal quotation marks, and citation omitted).

**A.  The Terms of the Operating Agreements Are Ambiguous**

**{20}** We turn to the language of the operating agreements and the evidence in the summary judgment record concerning the circumstances surrounding the parties' agreements and the parties' course of performance to determine whether the agreements' terms governing the timing of the distribution of profits are ambiguous.

**{21}** The dispute between the parties centers on Paragraphs 5 and 6 of the operating agreements. These paragraphs state, in pertinent part, as follows:

> **5.** <u>Profit and Loss</u>: The net profits of the [LLC] will be divided, and the net losses will be borne, by the Members in the percentages shown on the signature pages hereto. A separate Income Account shall

be maintained for each Member. A Member's share of [LLC] net profits or net losses for the [LLC] fiscal year will be credited or charged to the Income Account of the Member at the end of the [LLC] fiscal year. . . . No Member may withdraw any credit balance in the Member's Income Account until after dissolution and liquidation of the [LLC], but the Members may make Income Account distributions. No Member has any priority over any other Member as to net profit or loss.

      **6.**    <u>Distributions</u>: . . . The Members will distribute the available cash of the [LLC] to the Members at reasonable intervals; unless the Members determine otherwise, such distributions will be made contemporaneously to all Members in the percentages in which the Members share [LLC] net profits.

(Emphasis added.)

**{22}**   In determining whether these provisions are ambiguous, we first examine the language of Paragraphs 5 and 6 to determine if the terms of the agreement are unclear or uncertain. Paragraph 5 establishes the basic principle that the profits and losses of the Cook/Wilson Entities will be divided equally. The parties agree that equal division was intended. The dispute focuses on the meaning of the terms controlling the timing of that equal division. Paragraph 5 notes, in relevant part, that "[n]o Member may withdraw any credit balance in the Member's Income Account until after dissolution and liquidation of the [LLC]," but allows the members to make distributions from that account. Paragraph 6 discusses distributions in greater detail. It is the provision relied on by Cook to claim that distributions must be made to both members "contemporaneously" and in the percentages equal to their ownership interest. Importantly, however, Paragraph 6 includes the phrase, "unless the Members determine otherwise." It is not clear whether that phrase applies to allow the members to modify the intervals when distributions are made, to modify the percentage of profits distributed to each member, or to modify both of these. Nor is it clear how Paragraph 6 is to be construed together with Paragraph 5. The profits Paragraph 5 states will be distributed after dissolution of the business are not clearly identified.

**{23}**   We turn next to the extrinsic evidence in the summary judgment record concerning the parties' course of conduct in performing the agreements to assist us in determining whether these provisions are susceptible to more than one construction. *C.R. Anthony Co.*, 1991-NMSC-070, ¶¶ 14-15. The parties' course of performance further confuses the intended meaning of Paragraphs 5 and 6 of the operating agreements. The summary judgment motions and responses assume that there were unequal distributions made from 2004 to 2006. The parties agree that between 2006 and 2009, there were meetings between Cook and Wilson and their accountants to rebalance profits and losses. Despite agreement on the fact that meetings occurred and efforts to rebalance were made, there is stark disagreement on the inferences to be drawn from these facts. Cook claims his meetings with Wilson to agree on a rebalancing of profits were efforts to avoid litigation over breaches of contract that had occurred

between 2004 and 2006. Cook argues that, at the latest, Wilson's cause of action for breach of contract accrued when he discovered all of the facts necessary to sue on November 16, 2007. NMSA 1978, § 37-1-7 (1880). Alternatively, Cook argues that there was an oral agreement between the parties to rebalance distributions and the parties met pursuant to that agreement.

**{24}** "The statute of limitations on a breach of contract claim runs from the date the contract is breached." *Nashan v. Nashan*, 1995-NMCA-021, ¶ 29, 119 N.M. 625, 894 P.2d 402. Under each of Cook's explanations, Wilson's counterclaim would be time-barred: either Wilson's counterclaim was filed more than six years after the unequal distributions in 2004-2006 (or the discovery of the unequal distributions in November 2007), or it was filed more than four years after Cook's breach (in 2008 or 2009) of an oral agreement. *See* § 37-1-3(A) (establishing a six-year statute of limitations for written contracts); *see also* NMSA 1978, § 37-1-4 (1880) (establishing a four-year statute of limitations period for oral contracts).

**{25}** Wilson, in contrast, maintains that the evidence in the summary judgment record of repeated meetings between the parties and of the involvement of the Cook/Wilson Entities' accountants; Cook's February 2008 letter, seeking a delay in filing the tax returns to allow the rebalancing to be completed; and the testimony of Wilson and other witnesses as to the parties' stated intent to rebalance; together support a reasonable inference that the parties were meeting to rebalance accounts because rebalancing was required by the terms of the operating agreements.

**{26}** Having considered both the language of Paragraphs 5 and 6 and the extrinsic evidence in the summary judgment record, we conclude that the operating agreements adopted by Cook and Wilson are ambiguous; they are "reasonably and fairly susceptible of different constructions." *Mark V, Inc.*, 1993-NMSC-001, ¶ 12. Because the meaning of a contract where an ambiguity exists is a question of fact, *see id.*, we remand for trial to allow a jury to determine the meaning of the operating agreements and the date of breach.

## II. Cook's Cross-Appeal: The Undisputed Facts Support the District Court's Grant of Summary Judgment

**{27}** Cook cross-appeals from the district court's grant of summary judgment to Wilson holding that Cook's lawsuit against Wilson on his alleged breach of his personal guaranty was time-barred. The court held that, as a matter of law, Wilson had not made an unqualified admission sufficient to revive the debt under NMSA 1978, Section 37-1-16 (1957). On appeal, Cook does not dispute that the statute of limitations, measured by the date of Wilson's alleged breach of the guaranty, expired prior to the filing of his complaint. Cook argues, however, that his cause of action was revived by Wilson's written acknowledgement of the debt, pursuant to Section 37-1-16. Cook relies on the April 30, 2008, letter from the Cook/Wilson Entities' tax accountant, Balise, claiming that the letter and attached spreadsheet were a sufficient admission of the debt to restart the statute of limitations. We hold, based on undisputed documentary evidence in the

summary judgment record, that the April 30, 2008, letter from Balise to Cook was not an unqualified and unconditional admission of a debt sufficient to meet the requirements of Section 37-1-16. We affirm the district court's grant of summary judgment and the dismissal of Cook's claim as time-barred.

**{28}** Under New Mexico law:

> Causes of action founded upon contract shall be revived . . . by an admission that the debt is unpaid, as well as by a new promise to pay the same; but such admission or new promise must be in writing, signed by the party to be charged therewith.

Section 37-1-16.

**{29}** Cook claims there is a genuine issue of fact as to whether the April 30, 2008, letter from tax accountant Balise to Cook, conveying an offer of compromise from Wilson, was an admission of the debt sufficient to revive Cook's cause of action and restart the statute of limitations. Cook points to two issues on which he claims disputes of fact preclude summary judgment: (1) whether Balise was acting as Wilson's agent, thereby allowing Balise's signature on the April 30, 2008, letter to be attributed to Wilson; and (2) assuming Balise was acting as Wilson's agent, whether the letter and attached spreadsheet were sufficient to acknowledge the debt and revive the cause of action.[4] We conclude that, even if Balise acted as Wilson's agent, the district court did not err in granting summary judgment because the statutory requirements for admission that a debt is unpaid have not been satisfied.

**A.      The April 20, 2008, Letter and Spreadsheet Do Not Satisfy Section 37-1-16's Requirement for an Unqualified Admission of a Debt**

**{30}** Whether remand for trial on Cook's claim for breach of Wilson's personal guaranty of payment on the R & R Roadrunner Parking note is required turns on whether there are material facts in dispute as to whether the April 30, 2008, letter and accompanying spreadsheet met the statutory requirement for the "admission of indebtedness." Section 37-1-16.

**{31}** The portion of the April 30, 2008, letter relied on by Cook reads as follows:

> Rex [Wilson] will accept a payment of $1,387,388.55 from you to balance your interests in the Cook/Wilson [Entities]. As noted above, for settlement purposes only, Rex has made several concessions . . . . These concessions exceed several hundred thousand dollars. Rex will also enter into with you a mutual release and indemnification agreement in which you

---

4Cook also argues that the terms of Wilson's guaranty require application of a different standard of revival. We decline to address this argument because Cook makes it for the first time on appeal. *State v. Leon*, 2013-NMCA-011, ¶ 33, 292 P.3d 493 ("We generally do not consider issues on appeal that are not preserved below." (internal quotation marks and citation omitted)).

both agree to indemnify and hold each other harmless from any and all claims that you may have against the other with respect to your dealings in the Cook/Wilson [E]ntities.

Mr. Wilson is looking forward to your acceptance of this offer, please advise and I will have an attorney draft the necessary indemnification agreement. Mr. Wilson would like to resolve this by the end of May.

**{32}** The attached spreadsheet, in relevant part, lists a $771,014 amount in a column headed "Wilson owes Cook to balance," opposite the label "R & R Roadrunner Parking Inc."

**{33}** We consider the facts in the light most favorable to Cook, the nonmoving party. *See Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280. We note that to serve as a basis for denying a summary judgment motion, alleged disputes of fact must support reasonable inferences that make summary judgment inappropriate. *Id.* ¶ 10. Concluding that the letter and attached spreadsheet fail to meet the statutory requirement for an unqualified acknowledgment of a debt, even when all inferences from the undisputed facts are drawn in Cook's favor, we affirm the district court's grant of summary judgment and the dismissal of Cook's claim as barred by the statute of limitations.

**{34}** The parties do not dispute that the $771,014 amount in the spreadsheet column headed "Wilson owes Cook to balance," opposite the label "R & R Roadrunner Parking Inc.," refers to the amount of the guaranty sought to be enforced by Cook's lawsuit. To constitute an admission sufficient to revive the cause of action, however, New Mexico courts have interpreted Section 37-1-16 to require that the writing contain an unqualified and unconditional acknowledgment that the debt is unpaid. *Citizens Bank of Clovis v. Teel*, 1987-NMSC-087, ¶ 5, 106 N.M. 290, 742 P.2d 502 (holding that "the acknowledgement must be unqualified"); *Reymond v. Newcomb*, 1900-NMSC-016, ¶ 5, 10 N.M. 151, 61 P. 205 (holding that an "admission that a debt is unpaid" must be "unconditional, unlimited, and reasonably certain").

**{35}** The requirement that the acknowledgment that a debt is unpaid be "unqualified" or "unconditional" is central to New Mexico's revival statute. In *Reymond*, decided in 1900, our Supreme Court held that an "admission that a debt is unpaid" must be "unconditional, unlimited, and reasonably certain" in order to satisfy the terms of Section 37-1-16 and revive the cause of action.[5] 1900-NMSC-016, ¶ 5. In *Pugh v. Heating & Plumbing Finance Corp.*, almost a half century later, our Supreme Court quoted with approval the following language from the decision of the Nebraska Supreme Court: " 'To remove the bar of the statute, the debtor must unqualifiedly acknowledge an existing liability.' " 1945-NMSC-031, ¶ 26, 49 N.M. 234, 161 P.2d 714 (quoting *Nelson v. Becker*, 48 N.W. 962 (Neb. 1891)). Relying on this language, the Court held in *Pugh* that "an

---

[5]Although the predecessor statute analyzed in *Reymond* differs somewhat from the current Section 37-1-16, those differences relate to partial payments and do not affect the statutory language at issue in this case. *See Joslin v. Gregory*, 2003-NMCA-133, ¶ 11, 134 N.M. 527, 80 P.3d 464.

unaccepted offer of compromise" is not "a sufficiently clear and explicit acknowledgment of the obligation," to revive the statute of limitations. *Pugh*, 1945-NMSC-031, ¶¶ 27, 31.

**{36}** Applying these principles of law to the undisputed evidence in the record, we conclude that the April 30, 2008, letter is not the "unqualified" and "unconditional" acknowledgement of a debt required by Section 37-1-16. The letter and accompanying spreadsheet are, by their plain terms, an offer of compromise. By definition, an offer of compromise is conditioned on the acceptance of its terms by the other party. *Tatsch v. Hamilton-Erickson Mfg. Co.*, 1966-NMSC-193, ¶ 9, 76 N.M. 729, 418 P.2d 187 (holding that "an acceptance requires manifestation of unconditional agreement to all of the terms of the offer and an intention to be bound thereby" (internal quotation marks and citation omitted)). The April 30, 2008, letter explicitly qualifies the amounts shown in the spreadsheet with the caveat that they are "for settlement purposes only."

**{37}** The amounts shown in the spreadsheet are qualified, as well, by the description of each amount as "owed to rebalance." By the plain terms of the spreadsheet and the terms of the letter as well, the amounts listed are an admission that this amount is properly credited to Cook as an off-set for the purpose of rebalancing the Cook/Wilson Entities' accounts. There is no admission that this is a debt owed apart from the rebalancing.

**{38}** For these reasons, we hold that crediting an amount to Cook as part of the April 30, 2008, offer from Wilson to rebalance the Cook/Wilson Entities' accounts is not the unqualified and unconditional admission that a debt is owed required by Section 37-1-16 to revive a general cause of action in contract. We conclude that the district court correctly granted summary judgment and dismissed Cook's claim as barred by the statute of limitations.

**CONCLUSION**

**{39}** We affirm the district court's grant of summary judgment dismissing Cook's cause of action on Wilson's guaranty as barred by the statute of limitations. We reverse the grant of summary judgment on Wilson's counterclaim for a rebalancing of profits and losses, holding that there is a genuine dispute of material fact as to the meaning of the terms of the parties' operating agreements and as to the date of breach. We remand for trial. We caution that our decision is not intended to address the merits of Wilson's counterclaim: that issue is not before us. We also do not decide whether Cook is entitled to an offset of the guaranty amount if a rebalancing is ordered. That issue also is not before us.

**{40}** **IT IS SO ORDERED.**

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**MEGAN P. DUFFY, Judge**